[No. S016076. May 19, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN LEE HOLT, Defendant and Appellant.

634

638

COUNSEL

Jerry P. Gordon and Robert M. Myers, under appointments by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Roger E. Venturi and Gregory W. Baugher, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BAXTER, J.—John Lee Holt was convicted by a jury in the Kern County Superior Court of the July 6, 1989, first degree murder (Pen. Code, § 189)

(count 1) of Marie Margie Axtell;[1] first degree robbery (§ 212.5, subd. (a)) (count 2) of Axtell; rape (§ 261, former subd. (2)) (count 3) of Axtell; sodomy (§ 286, subd. (c)) (count 4) of Axtell; and first degree burglary (§ 460, subd. (a)) (count 5) of the Axtell residence. The jury also found true special circumstance allegations charging that the murder occurred during the commission or attempted commission of robbery, rape, sodomy, and burglary (§ 190.2, former subd. (a)(17)(i), (iii), (iv), and (vii)), and returned a penalty phase verdict of death for the murder. On May 30, 1990, the trial court denied an application for modification of the penalty verdict and imposed a judgment of death. (§ 190.4.)[2]

This appeal is automatic. (§ 1239, subd. (b).)

We shall reject defendant's several claims of prejudicial error at the guilt and penalty phases of the trial and affirm the judgment in all respects.

I

GUILT PHASE EVIDENCE

A. *The Prosecution Case*

Defendant had been employed for one month in door-to-door sales of household cleaning products on July 6, 1989, when he called at the Bakersfield home of 65-year-old Marie Axtell, a widow who lived alone. He had undergone a short training period before being sent to Bakersfield on July 3, 1989, as part of a 15-person sales crew which was staying in a local hotel. On the morning of July 6, defendant and Cameron Bearden, who had been assigned to assist in training defendant, worked together on one street, after which they split up. Defendant was repeatedly rebuffed in his efforts to make sales.

When defendant arrived at the home of Ms. Axtell, she was lying on the living room sofa. The door was open. When she said she did not want his products, defendant jerked opened the screen door, entered the living room, and sexually assaulted Ms. Axtell, first in the living room and then in the master bedroom of the home. Ms. Axtell was strangled and rendered unconscious at some point during the assault. Defendant then took jewelry from the bedroom, root beer from the refrigerator in the kitchen, and money from

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] The court imposed sentences of six years on count 2, eight years on count 3, eight years on count 4, and six years on count 5, with the term for count 3 to be consecutive to that imposed on count 2. The terms on counts 2 through 5 were stayed pursuant to section 654.

Ms. Axtell's wallet, which was on the kitchen table. Returning to the bedroom, he left the unopened root beer on a dresser, took more jewelry, and departed. His company identification badge was found in the living room. His fingerprints were found on items throughout the house, including the root beer can.

Glenn Copeland, Ms. Axtell's son, who lived in Tehachapi, had visited the Axtell house about 8 a.m. He left at 9 a.m. to do an errand for his mother. When he left the house, Ms. Axtell's purse and wallet were on the kitchen table. On Copeland's return to the house about 11:30 a.m., he saw a brown briefcase near the front door. The screen door, which his mother had latched when he left, was unlatched and open several inches. The latch had been bent. Alarmed, he entered and found his mother unconscious, lying face-down on the floor in the bedroom. What appeared to be a bag was in her mouth and a cloth was wrapped around her neck and double knotted. Copeland called 911, and after again checking his mother's condition went next door to seek assistance. As he left the house he confronted defendant who was picking up the briefcase. When accused, defendant denied being inside the house. When Copeland again accused defendant of being in the home, defendant said he was going to check with his boss in the van across the street. There was no van across the street. Copeland directed defendant to remain, but when Copeland returned two minutes later from the house of the neighbor, defendant and the briefcase were gone. Emergency vehicles arrived several minutes later and Ms. Axtell was taken to the hospital.

Just after he saw an ambulance on the street defendant was supposed to be working on, Cameron Bearden saw defendant near the pickup area for the sales crew. Defendant beckoned him to come over. Bearden observed that defendant was "hyper," his hair was "messed up," and he did not have his briefcase. The briefcase was one issued to salespeople by the company. It contained a "sales kit" of items used in making the sales presentation. Defendant said his briefcase was at the pickup area. Bearden saw the briefcase at the pickup stop. Defendant and Bearden were picked up by a supervisor in a company van. Defendant told the supervisor that he had not made any sales. The supervisor then dropped the two men off in the same area even though defendant said he wanted to work in another area. Defendant left the sleeveless vest he always wore, even in the Bakersfield heat, in the van.

The two men were then stopped by Detective West who had heard a police radio call regarding an attempted homicide and a description of a suspect. Defendant was carrying a brown briefcase. The location of the detention was one block from Ms. Axtell's home. West questioned defendant and Bearden

who denied having been on the street on which Ms. Axtell's home was located. He spoke to them for about 10 minutes.

Aubin, another officer, who had heard a description of the suspect, arrived to back up Detective West, as defendant and Bearden were walking away. He detained defendant and Bearden at the request of Detective West who arrived with Ms. Axtell's son. Glenn Copeland told the officers that he believed he recognized the briefcase carried by defendant, and one of the men as the person he had seen at his mother's house.

The officers conducted a pat-search of Bearden and defendant preparatory to placing them in a patrol car. Aubin found a pen, ointment jar, and jewelry in defendant's right front pants' pocket. Defendant was arrested and a more thorough search revealed $160 in $20 bills and cigarettes in the left front pocket.

In the meantime, Ms. Axtell was transported to a hospital where she died on July 15, 1989, without regaining consciousness. An examination at the time of her admission revealed no external trauma to the vaginal area. The vault was red, which was consistent with penetration by an adult penis, however. There was no evidence of external trauma in the anal area, but evidence of blood was found in a stool sample or the rectum. This was consistent with penetration by an adult penis. Other forensic evidence also connected defendant to the assault.

An autopsy revealed the following external injuries. The tip of Ms. Axtell's hyoid bone, located high in the throat area above the voice box, was fractured, as were the second and third cartilaginous rings of the trachea, located in the midline of the throat. The damage to the hyoid bone was consistent with manual strangulation. Fractures of the cartilages of the larynx can be seen in either manual strangulation or ligature strangulation. The pathologist later testified that bruises appearing in photos of Ms. Axtell's neck area were consistent with ligature strangulation. The cause of death was hypoxic brain damage due to strangulation. Death was the result of pneumonia involving both lungs with abscess in the lower lobe of the right lung which resulted from the brain damage.

Bearden identified the company photo-identification card found in Ms. Axtell's home as that issued by the company to defendant and testified that the briefcase was also company issue. He had been surprised at the amount of money found in defendant's pocket. The company never provided more than a $25 draw for lunch and other expenses, and during the time Bearden worked with defendant, defendant made very few sales.

Ms. Axtell's purse and wallet held no currency when examined by police. Ms. Axtell had cashed a $200 check on July 3, 1989, receiving all of the money in $20 bills. On July 4, she had spent just over $39. The jewelry in defendant's possession was identified as belonging to Ms. Axtell.

At the Bakersfield Police Department after his arrest, defendant had been advised of his constitutional rights. He had waived them and was questioned by Detective Boggs. Boggs testified that defendant initially denied any involvement in the crimes, but later admitted he had assaulted Ms. Axtell. He said he had been aggravated by people slamming doors in his face and became irritated when she said she was not interested in his products. When she told him to leave, something in his head "snapped," he got mad, jerked open the screen door, and grabbed Ms. Axtell with both hands around her throat and began to choke her as she rose from the couch. When his hand tired as she struggled and tried to escape, he released her and picked up a cloth he found in another part of the living room. He then returned to Ms. Axtell and placed her in a "choke hold." She continued to struggle until he tightened the choke hold and she became limp and semiconscious. He then wrapped the cloth around her neck and twisted it until she became unconscious. At some point he warned her that if she did not stop moving he would have to hurt her.

Defendant then dragged the victim into the bedroom, threw her onto the floor next to the bed and sexually assaulted her. He did not recall whether he had anal or vaginal intercourse, but had ejaculated. He denied stuffing anything into Ms. Axtell's mouth. He acknowledged that a belt found in the bedroom was his and came off during the struggle, but said he did not remember using it to choke the victim. After the sexual assault he got dressed, took several items of jewelry from a box on the dresser, went to the kitchen where he got a can of root beer, and returned to the bedroom, looked through jewelry and other items, and left. He denied taking any money from the residence. Defendant made his statement in a matter-of-fact demeanor, displaying little emotion.[3]

B. *The Defense*

Defendant was the only defense witness during the guilt phase. His testimony was consistent with his earlier statement to the police, and he confirmed that Detective Boggs's testimony was "pretty much [what I]

---

[3]Detective Boggs did not tape-record his interview with defendant. He explained that it was not his practice to do so because he believed that tape recording intimidated people. He also tried to maintain eye-to-eye contact with the person being interviewed. Operating a tape recorder, turning it on and off, and changing the tape interrupted the flow of the interview.

stated." Defendant testified that before approaching the Axtell home he had been the object of racial comments. Ms. Axtell told him she was not interested in his product. He persisted and showed her the product. She said she did not want to buy anything. He considered making another sales pitch, but decided to put the product back into the briefcase. At that point he "snapped" or "blew up," opened the screen door, and ran toward Ms. Axtell who was on the couch. On cross-examination he testified that he did not intend to sexually assault her when he entered, although he did intend to steal something from the house. He began choking Ms. Axtell and told her to remove the belt he was wearing which she did. He took the cloth from a pillow because his hands were getting tired, put it around her neck and tied it. He told her to remove her panties, and when he noticed the front door was open, took her to the bedroom where he pushed her onto the bed. He took items from the dresser, and then sodomized Ms. Axtell. Defendant denied vaginal penetration. Ms. Axtell was conscious at that time.

Defendant testified that he then went to the kitchen because he was hot and sweaty. He told Ms. Axtell to get off the bed and lie on the floor, which she did. In the kitchen he took a root beer can from the refrigerator and took the bills from a wallet he saw on the kitchen table. The money taken from him after his arrest was this money. He then returned to the bedroom, put the root beer can on the dresser and took some necklaces or chains. He looked through a jewelry box and took some jewelry. These were the items taken from him in the search at the time he was detained by the police. He left, leaving Ms. Axtell on the floor with the blue cloth still tied around her neck. Defendant testified that Ms. Axtell was conscious the entire time he was in the house. He denied putting the plastic bag in her mouth. He denied telling Detective Boggs that she was unconscious. He had not used that word, but had said that Ms. Axtell was not moving. The only time she started to lose consciousness was when he first grabbed her around the neck in the living room.

When defendant realized he had left his briefcase at the house he returned to get it. He rang the door bell, which was answered by Ms. Axtell's son who accused him of having been in the house. He said he "didn't do it" and left when the son went next door.

The defense conceded sodomy, but argued that the evidence of rape was insufficient, and that the broken hyoid bone and cartilaginous rings of the trachea might have been broken during attempts to resuscitate Ms. Axtell, in which case that injury could be an intervening cause of death.

## II

### PENALTY PHASE EVIDENCE

#### A. *Aggravating Evidence*

In addition to the circumstances of the offense, the aggravating evidence offered by the People was limited to evidence of two Colorado incidents. The first was the rape and robbery of 90-year-old Candeo Tresso during a burglary of her Pueblo Colorado home in 1984. Gino Tresso, son of the victim, testified that his mother did not speak English and had difficulty moving around, even with a walker. Gino Tresso visited her daily at lunch time. On October 7, 1984, he noticed that two windows which looked out from his mother's duplex unit into a garage were intact. When he arrived the next day, about 40 minutes after his sister, who lived with their mother, had left, he saw a brick and broken glass in the yard. The back door was locked, and when he entered he found Mrs. Tresso standing in the hallway "scared to death." She stated that she had been robbed. Her bank books were on the bed and envelopes in which she kept her money were scattered about. About $500 in cash was missing.

Subsequent examination revealed that Mrs. Tresso had been sexually assaulted. Defendant, then a juvenile placed in a home for troubled children, was questioned and denied involvement even when confronted with evidence placing him at the scene. When his fingerprints were identified he confessed, however, and eventually pled guilty.

The second incident led to defendant's conviction for the 1988 second degree burglary of the apartment of Mary and Glenn Johnson from which he took a ski jacket, a steak knife, an ashtray, and $1.57. He was apprehended by residents of the apartment building without violence.

#### B. *Mitigating Evidence*

The theory of the penalty phase defense was that, at the time of his assault on Ms. Axtell, defendant was in a state of altered consciousness, a "fugue state" caused by a temporal lobe epileptic seizure. The defense also attempted to evoke sympathy for defendant because his parents rejected him and because his childhood problems had been misdiagnosed as having an emotional origin when he was in fact brain damaged. As a result of the misdiagnosis, the responsible public agencies and residential facilities failed to provide appropriate treatment and remediation.

Evidence was presented that defendant suffered a brain injury at birth as a result of oxygen deprivation. He exhibited self-destructive behavior when he

was four years of age. He tried to stab himself, he cut his fingers and arms, he stole things, and he gave pesticide to a cousin to drink. At age nine he received treatment when he complained of hearing voices. At age 11 he was institutionalized for 10 months for auditory hallucinations of the devil who told him to do good or bad things. He was diagnosed at that time as having an undersocialized aggressive reaction to childhood.

Defendant's parents removed him against medical advice after he spent one year in a subsequent institutionalization at the Colorado Boys Ranch. In 1981, when he was 13 years old, he knocked an elderly woman down and fled with her purse after posing as a Boy Scout to help her with her groceries. Defendant's parents refused to have him returned to the home at one point and, when he was returned to his home even though a social worker reported that defendant's parents were abusive and uncooperative, his parents refused to participate in therapy, and refused to acknowledge any wrongdoing. They claimed that defendant was "evil," was "born from the devil," and expressed the view that defendant, rather than his twin brother, should have died shortly after birth.

Defendant's parents continued to be uncooperative and left the state, abandoning him, while he was in one group home placement. The social worker found that defendant had trouble following through on things, but believed this was due to emotional problems, not retardation. The emotional problems affected defendant's learning ability and led to a diagnosis of learning disability. In shelter schools he functioned at the second, third, and fourth grade levels, but was good at imitating things. From April 1982 to October 1984, defendant was in a residential child care facility for children with emotional problems and those who had committed criminal misconduct. He was then described as a very angry person who did not get along well with his peers, but while in this facility he became more receptive to staff, got along better with his peers, and opened up. He was permitted to attend a public middle school, an alternative school, and then a public high school as his grades got progressively better, possibly because he was in special education classes in which the standards were not as exacting as those in regular classes.

A clinical social worker at the residential facility testified that defendant had a "conduct disorder," a term used to describe persons under 18 who have significant social problems, lie, run away from home, lack respect for authority, and tend to deny responsibility for their behavior. Defendant did not sleep well, sometimes a symptom of depression. He was suspected of committing several burglaries before the rape and robbery of Mrs. Tresso while in this placement.

Following his conviction of the earlier offenses, defendant had been placed in a closed treatment center. The clinical therapist who worked with defendant there also believed he had an emotional disorder, not an organic problem. He did not act out his anger, but she could tell that he was angry. When upset he wore many layers of clothing even on hot days and refused to talk. Defendant's family participated in some family therapy, but his father was not willing to discuss abuse, rigid rules, or defendant's hatred of him. The mother seemed "overly physical" with defendant. Defendant continued to feel guilt about the Tresso assault and felt responsible when she later died of a heart attack.

Defendant was paroled in February 1988 and assigned to a subsidized housing unit. His parole agent testified that had she not been on vacation at the time she would have refused supervisory responsibility, as defendant was not ready to care for himself. He had no savings, was unemployed, and his social skills were deficient. Parole was terminated as a result of a court decision on June 1, 1988. At that time the parole agent was preparing to seek revocation of parole because defendant was becoming more frustrated and careless about taking care of himself and his apartment. He had lied about efforts to find employment and was not participating in treatment programs. He had told the parole agent about a door-to-door job which she believed was inappropriate because it involved travel outside the State of Colorado, and because defendant was a very serious offender who lacked the social skills necessary to handle rejection. She believed that with his low frustration level he might commit another offense if rejected.

When parole was terminated prematurely, defendant had to leave his apartment. He lived with his parents on two occasions for one week but they rejected him both times. He then committed the burglary for which he was convicted on August 3, 1988.

After defendant was convicted of second degree burglary in that incident, he was granted probation, but probation was revoked for 60 days when he tested positive for marijuana. He absconded two weeks later. A Colorado arrest warrant was outstanding when the California offenses were committed.

The defense also presented evidence that defendant actually suffered from a brain injury. Dr. Monte Buchsbaum, a professor of psychiatry and human behavior at the University of California at Irvine, testified that positron emission tomography (PET) testing suggested that appellant's temporal lobes and part of the frontal lobe of his brain were "two standard deviations below normal." Dr. Buchsbaum detected "emotional system damage" to the

cingulat gyrus portion of defendant's brain, damage consistent with sexual aberrations. Abnormality in defendant's frontal lobe was associated with judgment, planning, and execution functions, and suggested impulsiveness and poor judgment. Areas of his brain with diminished metabolic activity are those involved in cognitive skills—reading, writing, and arithmetic—and some kinds of abstract reasoning. The abnormalities were most likely a result of brain damage, possibly prenatal or during delivery, when a shortage of oxygen occurred or the head was damaged. The PET scan diagnosis was consistent with that from an electroencephalogram (EEG) which reflected abnormality in both temporal lobes of defendant's brain.

Dr. Buchsbaum concluded, based on the PET scan and EEG that an area of brain dysfunction was present, probably in both the left and right temporal lobes, and that because of brain damage defendant's brain function would be abnormal.

Dr. Buchsbaum acknowledged, however, that violent behavior cannot be predicted on the basis of the data obtained in the tests performed on defendant.

Dr. Raul Guisado had conducted a neurological examination of defendant, including an EEG. Computerized interpretation of that examination confirmed an unusual amount of alpha wave activity in the front of defendant's brain and a relative lack of activity in the side and back. There was abnormal theta wave activity in the temporal regions, and occasional abnormal bursts of theta wave activity in the temporal regions on both sides of defendant's head. Other tests reflected normal hearing, but abnormal processing of auditory information. Defendant described lifelong symptoms consistent with temporal lobe epilepsy. An abnormality in the function of the right hemisphere of the brain was also suggested by an abnormal relaxation of muscles on defendant's left side.

Dr. Guisado also performed tests on defendant related to auditory perception and cognitive ability. Based on the auditory tests, Dr. Guisado concluded that defendant had an abnormality on the right side of the brain, mostly localized in the right temporal lobe. This impaired defendant's ability to understand auditory information. The test of cognitive ability, the ability to pay attention and concentrate on one particular task, was normal.

In a history Dr. Guisado took from defendant, defendant described having experienced since age 14 or earlier sudden onsets of an abnormal sensation. His body would go numb, after which he had sharp pains either in the left arm or head. This was followed by a short period during which he was not

aware or completely aware of his surroundings. Defendant also stated that he sometimes had episodes when he blanked out. Dr. Guisado testified that these symptoms were commonly described by persons who suffered from temporal lobe epilepsy. While this was highly suggestive of an epileptic form disorder, it was not diagnostic of that condition. Defendant was also found to have abnormalities in the muscle tone on the left side of his body. This finding was tied very well to the physiological evidence of the involvement of the right hemisphere of defendant's brain.

Without additional information Dr. Guisado could not diagnose epilepsy in defendant. He did testify, however, that research into epilepsy and violent behavior suggests that persons with temporal lobe epilepsy, particularly that involving the right hemisphere of the brain, tended to have a higher degree of violent, impulsive behavior and aggression than normal people or those with abnormalities in the left side of the brain.

Samuel Benson, M.D., who also held doctorates in physiology and pharmacology, was a specialist in psychopharmacology, and treated persons who had been unsuccessful in other treatment programs. He interviewed defendant and evaluated him based on those interviews as well as records of defendant's birth, records of other experts, and a description of defendant's crimes. He concluded that defendant had an organic mental disorder and that there was tissue damage to the brain. Defendant had organic personality syndrome, a partial complex seizure disorder with brain damage particularly to the right temporal lobe. Dr. Benson concluded that the lesions in defendant's brain likely occurred at birth when defendant delivered in a "double-footed breach" position, did not breathe or cry for two minutes, had to be intubated, and was slow to react normally. He believed that defendant was deprived of oxygen for longer than two minutes, as the placenta would have started to break away when contractions and expulsion of the infant began. In addition, there would have been occlusion in the birth canal cutting off the flow of blood and oxygen to the brain. Defendant's childhood history included inability to learn, behavioral disturbance, and both auditory and visual hallucinations, which were all signs of organic brain damage.

The treatment defendant received in Colorado was not appropriate for a person with organic brain injuries. In Dr. Benson's opinion defendant did have epilepsy which he had attempted to conceal. Defendant very much wanted to believe that he was normal and to appear normal to others. While defendant's symptoms were observed and recorded by those providing therapy, they did not have defendant's birth records, and defendant was never seen by a competent neurologist or psychiatrist. The therapy provided was not effective with a person who had organic brain damage. The proper

therapy would have been administration of medications which increase the activity of the brain cells that functioned below normal levels, and antiseizure medication to raise the seizure threshold and allow the brain to function in a normal manner.

This expert believed that defendant "confabulates." In his description of the crimes against Ms. Axtell, although he could not tell Dr. Benson what he intended to do at a particular time, and there were moments in which it was "like he was not there," he added to his "recollection" of the crimes against Ms. Axtell details he had learned from others. The events about which defendant lacked recall, and as to which his description of the crime varied in different interviews with the experts and Detective Boggs, were not crucial to defendant's guilt or innocence. He had no incentive to lie about them and simply tried to fill in the gaps in his memory. This is common with people who have organic brain disease. Defendant's actions during the crimes, such as leaving the briefcase and identification tag, getting the root beer but not drinking it, and other conduct that was nonsensical, reflected a disorganization which, when coupled with defendant's description of his right temporal lobe pain, the odd feeling down his left shoulder with loss of control and tremor of his left arm and a tingling sensation, followed by a period of confusion, suggested to Dr. Benson that at the time of the attack on Ms. Axtell defendant was experiencing a seizure disorder.

Dr. William Pierce, a clinical psychologist, whose report Dr. Benson had reviewed, had himself reviewed the various records about defendant, and had interviewed defendant, his brother, and the persons who had tested or worked with defendant. He testified that defendant was bewildered about his situation, genuinely tried to piece together what had happened and was embarrassed by his conduct. Like Dr. Benson, Dr. Pierce was impressed by the impulsiveness of defendant's conduct and his confusion and spotty recollection of his acts. Dr. Pierce, too, concluded that defendant had an organic mental disorder, an organic personality syndrome evidenced by aberrant behavior at a very young age and, in later years, leading to development of a borderline personality disorder within the meaning of the third edition of the Diagnostic and Statistical Manual of Mental Disorders.

Dr. Pierce also found evidence in the tests he administered that defendant's problems were organic in nature, and he believed that defendant was in a "fugue" state at the time of the offenses. In that state a person does not lose consciousness, but there is an alteration of consciousness resembling a dreamy or twilight state, followed by confusion that is reflected by gaps in memory. It is characteristic of the disorder for a person to act out very violent behavior that almost looks planned, and for the person to be in a state

in which it seems they see themselves doing the act. They give a third party description of their conduct, as if they were watching it. Defendant described his conduct to Dr. Pierce in this manner. Dr. Pierce was also impressed that the things that defendant said he did not remember—such as what happened to his belt, losing his name tag, and putting the plastic bag in Ms. Axtell's mouth—did not help or hurt him. Like the other experts, Dr. Pierce could not rule out the possibility that defendant had lied in some of his statements, but he did not believe that to be the case. Rather, the memory gaps and later confabulation as defendant tried to fill them in were symptomatic of the fugue state in which defendant had been acting during the temporal lobe attack.

After closing argument and instruction, the jury returned a penalty verdict of death after 60 minutes of deliberation. Defendant's motions to strike the special circumstances and automatic motion for modification of the penalty (§ 190.4) were denied. Glenn Copeland and defendant each addressed the court, after which the court pronounced judgment, imposing the death penalty for the murder of Ms. Axtell and determinate terms on the remaining counts.

## III

### JURY-RELATED ISSUES

Defendant claims that three jurors were improperly excluded, that the voir dire conducted by the trial court was inadequate, and that the court erroneously failed to inquire into the bias of a seated juror and to excuse that juror. We address each claim individually.

### A. *Witherspoon-Witt Claims*

█ In *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [88 S.Ct. 1770, 20 L.Ed.2d 776] (*Witherspoon*), the Supreme Court held that a capital case prospective juror may not be excused for cause on the basis of moral or ethical opposition to the death penalty unless the juror's views would prevent the juror from judging guilt or innocence or would cause the juror to reject the death penalty regardless of the evidence. Excusal is permissible only if the juror makes this position "unmistakably clear." (391 U.S. at p. 522, fn. 21 [88 S.Ct. at p. 1777].) That standard was amplified in *Wainwright* v. *Witt* (1985) 469 U.S. 412 [105 S.Ct. 844, 83 L.Ed.2d 841] (*Witt*), where the court, adopting the standard previously enunciated in *Adams* v. *Texas* (1980) 448 U.S. 38, 45 [100 S.Ct. 2521, 2526, 65 L.Ed.2d 581], held that a prospective juror may be excused if the juror's voir dire responses convey a

"definite impression" (469 U.S. at p. 426 [105 S.Ct. at p. 853]) that the juror's views "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Id.* at p. 424 [105 S.Ct. at p. 852], fn. omitted.) The *Witt* standard applies here. (*People* v. *Avena* (1996) 13 Cal.4th 394, 412 [53 Cal.Rptr.2d 301, 916 P.2d 1000]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250].) If a juror's responses are conflicting or equivocal, the trial court's ruling is binding on us. (*People* v. *Lucas* (1995) 12 Cal.4th 415, 481 [48 Cal.Rptr.2d 525, 907 P.2d 373]; *People* v. *Mincey* (1992) 2 Cal.4th 408, 456-457 [6 Cal.Rptr.2d 822, 827 P.2d 388].) If not, we will uphold the trial court if the ruling is fairly supported by substantial evidence in the record, giving deference to the trial court which had the opportunity to observe and listen to the juror. (*People* v. *Cain* (1995) 10 Cal.4th 1, 60 [40 Cal.Rptr.2d 481, 892 P.2d 1224]; *People* v. *Wader* (1993) 5 Cal.4th 610, 652 [20 Cal.Rptr.2d 788, 854 P.2d 80].) Defendant contends that two prospective jurors were erroneously excused for cause under these standards.

### 1. *Jerry Richards*

█ Defendant argues that prospective juror Richards stated without reservation that he would be able to decide guilt and special circumstance charges without regard to the potential punishment and stated that he could fairly listen to the evidence presented at the penalty phase and could vote for the death penalty.

Richards placed a significant qualification on his willingness to vote for death, however, stating in response to the prosecutor's voir dire question: "It would be hard for me to consider the death penalty if I didn't in my mind believe that he intentionally went there to do that. If it happened while he was doing other things, I would still be inclined to convict him but not— maybe not so the death penalty."

The court then attempted to clarify the juror's attitude toward imposition of the death penalty for an unintentional felony murder, asking whether Richards was "saying that even though the defendant would have been convicted of murder of the first degree and a special circumstance or more of them were found to be true that you couldn't impose the death penalty unless, in addition to all that, you were convinced that the defendant intentionally killed the victim, that is that the murder was intentional, that he intended that she should die?"

Richards responded: "I would have to feel that he intended to kill her for me to apply the death penalty." After defendant's counsel declined the

court's offer to permit additional voir dire,[4] the court granted the People's challenge for cause, excusing Richards.

Relying only on Richards's earlier response that he would "have difficulty" in imposing the death penalty, defendant claims that the trial court erred. We disagree. There was a hesitancy in the juror's initial statement that he would have "difficulty" imposing the death penalty when a killing was not intentional. The prosecutor believed that answer to be sufficiently unequivocal to support a challenge for cause and for the court to ask additional questions. When the court asked those additional questions, Richards apparently resolved the matter in his mind and answered unequivocally that he would not impose death for an unintentional killing. The juror's attitude was sufficiently clear at that point that defendant's counsel made no effort to rehabilitate him.

Richards's answer was not, as defendant now claims, simply the expression of a preference for life imprisonment. Nor was it only a moral assessment or statement of what he believed would be the appropriate penalty under the evidence in the particular case. The voir dire did not set forth the evidence. It was directed only to the charges. The law of this state provides that death may be imposed for a murder committed in the perpetration of an enumerated felony regardless of whether the killing was intentional. (§ 190.2, subd. (a).) The juror stated unequivocally that he could not impose death for a killing that was not intentional and simply occurred in the course of the felonies set out in the charged special circumstances. This was a statement indicating that he could not follow the law. The court's action is fairly supported by the record.

### 2. *Erlinda Jones*

Defendant next argues that the court had insufficient evidence on which to excuse prospective juror Erlinda Jones from the jury panel, and that she did not indicate she would refuse to weigh the evidence during the penalty phase. ■ The test is not whether the juror would refuse to weigh the evidence, but whether, having done so, the juror would be unable or unwilling to impose the death penalty. If the voir dire is adequate to permit the

---

[4]We have not decided whether "nonopposition" to a *Witherspoon-Witt* challenge for cause waives any claim of error on appeal. (See *People* v. *Cain, supra,* 10 Cal.4th 1, 61, fn. 22.) We recognized that controlling federal precedent holds that *Witherspoon* error is not waived by "mere" failure to object in *People* v. *Velasquez* (1980) 26 Cal.3d 425, 443 [162 Cal.Rptr. 306, 606 P.2d 341], judgment vacated and case remanded *sub nom. California* v. *Velasquez* (1980) 448 U.S. 903 [100 S.Ct. 3042, 65 L.Ed.2d 1132] for further consideration in light of *Adams* v. *Texas, supra,* 448 U.S. 38, reiterated in its entirety (1980) 28 Cal.3d 461 [171 Cal.Rptr. 507, 622 P.2d 952].

court to make the latter determination, it is not necessary that the juror also be asked specifically if he or she would weigh the evidence.

The voir dire of Jones elicited responses similar to those of two jurors in *People* v. *Wash* (1993) 6 Cal.4th 215, 255 [24 Cal.Rptr.2d 421, 861 P.2d 1107], who also repeatedly insisted that they did not know if they could impose the death penalty and could not tell the court the answer to that question. In both instances we concluded that the responses were equivocal and found no *Witt* error in excusing the jurors for cause.

The answers by Jones were not simply equivocal. She never stated that she would consider imposition of the death penalty. She repeatedly expressed inability to state whether she could vote for death. The closest she came to even implying that she might be able to impose the death penalty was an affirmative answer when asked if she would have great difficulty in doing so. The trial court exercised considerable restraint and patience attempting to elicit meaningful responses from Jones, and was justified in concluding that she could not carry out her obligations as a juror at the penalty phase. After the prosecutor challenged Jones for cause, defense counsel, apparently satisfied with the voir dire by the court and the prosecutor, twice declined the opportunity to inquire further into her views. Defendant will not now be heard to complain that more specific questions were not asked regarding Jones's ability to weigh the evidence.[5] We find no error.

[5]Jones had indicated on a juror questionnaire that she believed the death penalty was used too often and that the defendants "need help." When asked if there was any possibility that she could vote for the death penalty if the evidence convinced her that it was a proper case, she replied that it was "hard for me to answer. I wouldn't know. I don't know. All these that you are asking me it's going to be hard for me to even answer."

The court tried again, further explaining the jurors' role and again asking if there was any possibility that Jones could vote for the death penalty. Again she said that she could not answer and "I don't know. That's just hard. I don't know what to say." The dialogue continued:

"[The court]. Well, what do you mean when you say you are against—what did you mean when you said that I don't believe in the death penalty? What do you mean by that?

"A. What do I mean by that? I guess it's not right. I don't know. This is my first time. It's just hard. I don't know what to tell you.

"Q. This your first time and it's everybody's first time coming in on a death penalty case. I don't think there is any juror that's going to serve on this case that's already served on a death penalty case. That's going to be the first time for every juror, but the jurors nevertheless answer the questions.

"I'm not asking if this is the first time that you have been on the case. I'm asking you about your belief. When you say I don't believe in the death penalty, what do you mean by that? I mean, when you were out on the street and before you ever came to this court on this case, did you believe in the death penalty?

"A. In a way, yeah.

"Q. You did?

## B. *Bias/Conflict of Interest*

### 1. *Jacqueline Etta Cummings*

 Prospective juror Jacqueline Etta Cummings had a lawsuit pending against the district attorney at the time she was called for service in this case. She was excused for cause on the prosecutor's challenge even though she stated that the pending action would not affect her ability to be impartial.[6] Again, defense counsel acquiesced, simply submitting the question without objection or argument. In excusing Cummings the court stated that the

---

"A. Yeah.

"Q. But now that you come to this court, now you don't believe in the death penalty, is that it?

"A. Well, sometimes. I don't think it's right. That's the way my mind tells me. I just don't believe in it.

"Q. Have you ever made that statement to anybody before that you don't believe in the death penalty?

"A. No, not really.

". . . We have to ask you these questions simply to find out how you feel about the death penalty and if you are capable of being a juror and serving on this case. But I can't get there unless I know for sure what you think about the death penalty.

"You said in here that you don't believe in it, but then when I ask you, you say that maybe when you were out on the streets before and the past that you did believe in the death penalty. Have you believed it in the past and changed your mind or what?

"A. Well, it looks like that, yeah.

"Q. I'm asking you what's in your mind. You should be able to tell me what's in your mind?

"A. I don't believe in the death penalty.

"Q. Is that all—have you always felt that way?

"A. Yeah, I guess."

Defense counsel again declined the opportunity to ask additional questions. In response to the prosecutor's question whether, given her feeling, Jones felt "it would be extremely difficult for you to vote for a death penalty regardless of what the evidence was" she replied "yes." Again defense counsel declined the opportunity to attempt to clarify whether Jones could or would ever vote to impose death.

The court excused Jones "because it appears that she is against the death penalty. I'm not sure about it all because her answers are not clear and she does not respond to questions."

[6]It appears from the record that Cummings's brother, sister-in-law, and two friends had been arrested in connection with a "Satanism" charge. Her children and her nieces and nephews were to be witnesses. Some children had been removed from their homes. She considered the children to be "victims" for that reason, and acknowledged that she bore resentment toward the office of the district attorney "in that case, but that was a totally different case, of course." She had "lawsuits pending against their office, too, but—I hold them responsible for some of my children's nightmares and so on, but their jobs—they still have their job that has to be done." Her resentment was against the "sex coordination unit" of the district attorney's office. She did not "think it would be a factor. This Deputy District Attorney here was not involved." She assured the court that she could put it aside and it would not affect her deliberations in any way.

pendency of the lawsuit would constitute a conflict of interest.[7] Defendant argues that this was error inasmuch as Cummings had the statutory qualifications for serving as a trial juror (Code Civ. Proc., §§ 203, 228) and the trial court found no actual bias. (Code Civ. Proc., § 225, subd. (b)(1)(C).) The error, he claims, burdened Cummings's First Amendment right to petition the government (by suing the district attorney),[8] and his rights to a fair and impartial jury under the Sixth, Eighth, and Fourteenth Amendments by depriving the jury panel of a juror with scruples against the death penalty who could not be disqualified under the *Witherspoon-Witt* standard.

It is not clear from the statement that the court did not question Cummings's integrity when she said she would be fair that the court did not find actual bias. That statement and the remark that the pending lawsuit created a conflict of interest as a matter of law could be understood as a conclusion that notwithstanding Cummings's belief that she could be fair, the court believed that actual bias existed.

A juror is disqualified and thus subject to challenge for cause (Code Civ. Proc., § 227, subd. (c)) on the basis of "[a]ctual bias—the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party." (Code Civ. Proc., § 225, subd. (b)(1)(C).) A juror is also disqualified for "[i]mplied bias—as, when the existence of the facts as ascertained, in judgment of law disqualifies the juror." (Code Civ. Proc., § 225, subd. (b)(1)(B).) Code of Civil Procedure section 229 limits the causes for which a challenge for implied bias may be made to those set forth in that section. The pendency of a prospective juror's lawsuit against a party is not among the causes recognized in that section.

The People argue that, if the court's action was error, it was waived by defendant's failure to object. Defendant counters that, because the People made the challenge for cause, he had no obligation to object.

 "In general, the qualification[s] of jurors challenged for cause are 'matters within the wide discretion of the trial court, seldom disturbed on

---

[7]The court explained the ruling: "I think there is a conflict of interest. . . . I'm not questioning your integrity, the fact that you say you're going to be a fair [*sic*] if you are a juror in this case, but when you have a lawsuit against the prosecuting agency, which is the District Attorney's Office, I think the—when the District Attorney's office is prosecuting the case, that amounts to a conflict of interest on the part of a juror probably as a matter of law."

[8]We assume, arguendo, that defendant may make this claim based on invasion of the rights of another to serve as a juror. (See *J.E.B.* v. *Alabama* ex rel. *T.B.* (1994) 511 U.S. 127 [114 S.Ct. 1419, 128 L.Ed.2d 89]; *Batson* v. *Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69].)

appeal.'" (*People* v. *Kaurish* (1990) 52 Cal.3d 648, 675 [276 Cal.Rptr. 788, 802 P.2d 278].) ■ We cannot say that the trial court abused its discretion here by upholding a challenge for cause based on the fact that the challenged juror was suing the district attorney. Moreover, defendant cites no authority for his assumption that an error in excusing a juror for reasons unrelated to the jurors' views on imposition of the death penalty requires reversal. ■ "[T]he general rule [is] that an erroneous exclusion of a juror for cause provides no basis for overturning a judgment." (*Fein* v. *Permanente Medical Group* (1985) 38 Cal.3d 137, 148 [211 Cal.Rptr. 368, 695 P.2d 665].) ■ Defendant claims that he was denied a juror with scruples against the death penalty who could not have been disqualified on *Witherspoon-Witt* grounds, but Cummings was not excluded on those grounds. Defendant has a right to jurors who are qualified and competent, not to any particular juror. (*Ibid.*) He does not assert that, as a result of the excusal of Cummings, a juror was seated who did not meet those criteria or that, as a result of her excusal, he was tried before a jury that was not fair and impartial.

■ There is merit in the People's argument that a defendant should be required to object to the excusal of a juror on grounds other than a *Witherspoon-Witt* challenge in order to preserve any claim of error for appeal.[9] We held in *People* v. *Ashmus* (1991) 54 Cal.3d 932, 987, footnote 16 [2 Cal.Rptr.2d 112, 820 P.2d 214], that a defendant has an obligation to preserve a claim that discharge of a juror is error. "As a general rule, a defendant may properly raise in this court a point involving a trial court's allegedly improper discharge of a juror only if he made the same point below." (*Ibid.*) While we have not addressed the impact of a failure to object to a ruling excusing a juror for cause in this context, we see no reason that the *Ashmus* rule should not apply to excusing, as well as to discharging, a juror.

We have held in analogous situations that an objection is necessary to enable the court to avoid or correct error. In *People* v. *Champion* (1995) 9 Cal.4th 879, 907 [39 Cal.Rptr.2d 547, 891 P.2d 93], e.g., we held that the

[9]In *People* v. *Mickey* (1991) 54 Cal.3d 612, 665, footnote 7 [286 Cal.Rptr. 801, 818 P.2d 84], we held that the *Velasquez* rule (*ante,* fn. 4) applied only to *Witherspoon* error, and was inapplicable to other claims of constitutional error in excusing jurors.

In the *Witherspoon* context a challenge for cause puts the question raised by that type of challenge in issue in a timely fashion. The voir dire in the death qualification process of jury selection in a capital case is necessarily focused on the standard by which that challenge is to be judged. The same cannot be said for defendant's response to the People's challenge here. He did not articulate the legal basis for the argument he now makes that excusing the juror has violated his rights or call to the attention of the judge the law he now claims was applicable. Had defendant done so, the court would have had an opportunity to weigh those considerations before ruling on the People's challenge. (*People* v. *Mickey, supra,* 54 Cal.3d at p. 664.)

defendant failed to preserve the issue for appeal when he failed to object on the ground asserted on appeal—that he had been denied a jury drawn from a representative cross-section of the community because wage earners were systematically excluded when the trial court granted hardship excuses to several jurors. In *People* v. *Fauber* (1992) 2 Cal.4th 792, 816 [9 Cal.Rptr.2d 24, 831 P.2d 249], we held that failure to object to the panel or move to quash the venire on the basis that excusing hearing-impaired prospective jurors denied the defendant the right to a jury drawn from a representative cross-section of the community waived the point. In *People* v. *Howard* (1992) 1 Cal.4th 1132, 1159 [5 Cal.Rptr.2d 268, 824 P.2d 1315], we held that an appellate claim that the trial court's excusal of prospective jurors for hardship resulted in a venire that did not fairly represent the Hispanic population of the county was waived. In *People* v. *Gallego* (1990) 52 Cal.3d 115, 166 [276 Cal.Rptr. 679, 802 P.2d 169], we applied the rule to an appellate claim that the court should have inquired into the prosecutor's use of preemptory challenges to remove Blacks from the jury. Then, in *People* v. *Visciotti* (1992) 2 Cal.4th 1, 38 [5 Cal.Rptr.2d 495, 825 P.2d 388], we acknowledged the court's obligation to comply with statutory jury selection procedures designed to ensure random selection, but held that a failure to object could, nonetheless, constitute a waiver. "[I]mportant policies mandate that criminal convictions not be overturned on the basis of irregularities in jury selection to which the defendant did not object or in which he has acquiesced. (Cal. Const., art. VI, § 13; *People* v. *Edwards* (1991) 54 Cal.3d 787, 813 [1 Cal.Rptr.2d 696, 819 P.2d 436].) The failure to object will therefore continue to constitute a waiver of a claim of error on appeal."

The reason for such a rule is apparent. We cannot assume that a party who fails to object to the excusal of a juror wants to have that juror on the panel. Taking a neutral position as defendant did here may be a tactical choice. If the juror is excused, the defendant need not use a peremptory challenge to remove the juror. Having made that choice the defendant should not be heard to complain on appeal that excusing the juror was reversible error.

We explained in *People* v. *Mickey, supra*, 54 Cal.3d 612, 664, in the context of hardship excusals: "A defendant may properly raise in this court a point involving an allegedly improper excusal for undue personal hardship only if he made the same point below. The requirement of a contemporaneous and specific objection promotes the fair and correct resolution of a claim of error both at trial and on appeal, and thereby furthers the interests of reliability and finality. When a contemporaneous and specific objection is made, the parties are put on notice to characterize the claim as they think proper and to set out the law and facts as they deem necessary. With their response, the trial court is provided with a basis on which to define the claim

and then determine whether it is meritorious and, if so, how any harm may be avoided or cured as promptly and completely as possible. On such a record, the appellate court may then decide whether a challenge to the trial court's ruling is sound."

Defendant offers no reason why the requirement of an objection to an excusal of a juror for cause should not apply to non-*Witherspoon-Witt* challenges other than an assertion that the ruling here was made on a challenge brought by the People. Nothing in *Ashmus* or in the *Mickey* reasoning is inapplicable to such challenges for cause, and we conclude that in the future an objection must be made if a claim of error in excusing the juror is to be preserved for appeal. Nonetheless, because at the time of this trial we had not expressly held that an objection is necessary, we do not apply this rule here. (See *People* v. *Scott* (1994) 9 Cal.4th 331, 357-358 [36 Cal.Rptr.2d 627, 885 P.2d 1040].) In any trial which commences after finality of this opinion, however, the failure to object will be deemed a waiver of the claim.[10]

### 2. *Billy Ross*

After the jury had been sworn, opening arguments made, and pre-instructions given, Juror Billy Ross informed the court that his son had been arrested and charged with felony assault in an incident in which the son entered a rental unit owned by Ross and occupied by an African-American woman to fix a broken door. The court interrupted Ross's explanation of the incident, and questioned him on his ability to be fair. Ross expressed his belief that he could continue to be so and remained on the jury after the court expressly found that Ross could continue to serve as a juror as he had indicated his ability to follow instructions and decide the case based upon the evidence and that he could be fair to both sides.

Defendant complains that the court's inquiry was inadequate, and removal of Ross was mandatory, as Ross himself might have had some (unidentified) criminal liability as he might be responsible as a principal for his son's conduct. Finally, he argues the fact that the son was facing criminal charges

---

[10]Defendant's argument that excusing Cummings violated state and federal constitutional guarantee of equal protection and the right to petition the government also lacks merit. He assumes that Cummings was excused solely because she exercised her right of petition by filing suit. (See *City of Long Beach* v. *Bozek* (1982) 31 Cal.3d 527, 534 [183 Cal.Rptr. 86, 645 P.2d 137], judg. vacated and cause remanded (1983) 459 U.S. 1095 [103 S.Ct. 712, 74 L.Ed.2d 943], reiterated (1983) 33 Cal.3d 727 [190 Cal.Rptr. 918, 661 P.2d 1072].) Not so. She was excused because the court concluded that the pendency of the lawsuit against the prosecutor's employer constituted a conflict of interest, and that, as a result she was or might be biased. Whether or not that assessment was accurate, the court did not excuse her "solely because she initiated litigation against the government" as defendant suggests.

was a factor that bore on the qualifications of Ross and the court might have inferred that he harbored a bias.

These claims lack merit. The suggestion that Ross might be criminally responsible for the offense with which his son was charged is speculation as is the suggestion that Ross might be tempted to "curry favor" with the prosecutor. Nothing in the record suggests that Ross solicited, ordered, encouraged, aided, or abetted his son in the conduct underlying the criminal charge. Criminal liability under section 31 is not based on a tort theory of respondeat superior.[11] The court was obviously aware that the incident was a factor and that bias was a possibility. The questions put to Ross reflected that awareness. Ross had informed the court of the incident immediately, and nothing in his responses to the court's inquiries suggested that he would be biased against defendant and could not perform his duty. (§ 1089.)[12] His tone and demeanor apparently satisfied not only the judge, but all counsel, as neither defendant nor the prosecutor sought his removal. Both counsel were afforded the opportunity to ask additional questions of Ross: only the prosecutor did. Ross assured him also that he could put the incident involving his son out of his mind and evaluate the case solely on what he heard in the courtroom.

■ Before an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's functions must be shown by the record to be a "demonstrable reality." The court will not presume bias, and will uphold the trial court's exercise of discretion on whether a seated juror should be discharged for good cause under section 1089 if supported by substantial evidence. (*People* v. *Beeler* (1995) 9 Cal.4th 953, 975, 989 [39 Cal.Rptr.2d 607, 891 P.2d 153].) ■ Substantial evidence supports the trial court's ruling here. There was no abuse of discretion.

The circumstances are simply not comparable to those in the decisions on which defendant relies in some of which jurors were excused and the

[11]Section 31: "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, and all persons counseling, advising, or encouraging children under the age of fourteen years, lunatics or idiots, to commit any crime, or who, by fraud, contrivance, or force, occasion the drunkenness of another for the purpose of causing him to commit any crime, or who, by threats, menaces, command, or coercion, compel another to commit any crime, are principals in any crime so committed."

[12]Section 1089 provides, inter alia: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his duty . . . the court may order him to be discharged and draw the name of an alternate, who shall then take his place in the jury box . . . ." (Final par.)

defendant complained of that on appeal. (See *People* v. *Morris* (1991) 53 Cal.3d 152, 154 [279 Cal.Rptr. 720, 807 P.2d 949] [same deputy district attorney had prosecuted juror]; *People* v. *Williams* (1988) 199 Cal.App.3d 469 [245 Cal.Rptr. 61] [juror personally facing prosecution in case filed by same deputy district attorney]; *People* v. *Farris* (1977) 66 Cal.App.3d 376 [136 Cal.Rptr. 45] [juror facing current criminal charges, had past charges and attitude]; *In re Devlin* (1956) 139 Cal.App.2d 810 [294 P.2d 466] [juror charged with felony did not believe he could be fair].)

### C. *Inadequate Voir Dire*

#### 1. *Inquiry Into Possible Racial Bias*

Defendant, who is African-American, next argues that he was denied his Sixth Amendment right to a fair, impartial, and racially unbiased jury because the voir dire conducted by the court was inadequate to remove jurors who harbored particular prejudices or biases. It was not, he claims, "a suitable inquiry . . . to ascertain whether [each] juror has any bias, opinion, or prejudice that would affect or control the fair determination by him [or her] of the issues to be tried" (*Connors* v. *United States* (1895) 158 U.S. 408, 413 [15 S.Ct. 951, 953, 39 L.Ed. 1033]) because it did not include all areas of inquiry recommended by the Judicial Council, and the manner in which the court's questions were asked "telegraphed" the correct response.[13] He asserts that particular care was needed in this case because Kern County has a history of racism. There is no evidence in this record that racism is currently prevalent in Kern County, however. At least one superior court judge in that county has rejected that assertion. (See *People* v. *Chaney* (1991) 234 Cal.App.3d 853, 859 [286 Cal.Rptr. 79].)

Nonetheless, adequate inquiry into possible racial bias is, as defendant claims, essential in a case in which an African-American defendant is charged with commission of a capital crime against a White victim. (*Mu'min*

---

[13]A typical inquiry, asked in two questions directed to the venire as a group, was: "Now, the defendant is a black person. That shouldn't make any difference especially in this day and age, but nevertheless that's the case and I do have to ask the question. Are there any amongst you who feel that you have any bias or prejudice against a black person or against the defendant because he is a black person so that you could not be a fair and impartial juror in this case, fair to the defendant?

"Are there any amongst you who feel that black persons are more likely to commit a crime or to specifically commit murder than other people simply because of their color?"

Section 8.5(b)(18) of the California Standards of Judicial Administration (West's Ann. Cal. Codes, Rules (Appen.) (1996 ed.) p. 663) (Standards), suggests this inquiry: "It may appear that one or more of the parties, attorneys or witnesses come from a particular national, racial or religious group (or may have a life style different than your own). Would this in any way affect your judgment or the weight and credibility you would give to their testimony?"

v. *Virginia* (1991) 500 U.S. 415, 425 [111 S.Ct. 1899, 1905, 114 L.Ed.2d 493].) The defendant is entitled to have prospective jurors told the race of the victim and to have them questioned on the issue of possible racial bias. (*Turner* v. *Murray* (1986) 476 U.S. 28, 36-37 [106 S.Ct. 1683, 1688-1689, 90 L.Ed.2d 27]; *People* v. *Kelly* (1992) 1 Cal.4th 495, 517 [3 Cal.Rptr.2d 677, 822 P.2d 385].) As the court noted in *Mu'Min*, however: " 'Despite its importance, the adequacy of *voir dire* is not easily subject to appellate review. The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions.' " (500 U.S. at p. 424 [111 S.Ct. at p. 1904], quoting *Rosales-Lopez* v. *United States* (1981) 451 U.S. 182, 188 [101 S.Ct. 1629, 1634, 68 L.Ed.2d 22].)

Trial court judges should closely follow the language and formulae for voir dire recommended by the Judicial Council in the Standards to ensure that all appropriate areas of inquiry are covered in an appropriate manner. Failure to use the recommended language may be a factor to be considered in determining whether a voir dire was adequate, but the entire voir dire must be considered in making that judgment.

Here, unlike *Mu'Min*, the inquiry was not conducted by the judge alone. Both sides were afforded unlimited opportunity to inquire further into the views of the prospective jurors and to probe for possible hidden bias and took advantage of that opportunity. The voir dire conducted in this case covered substantially all of the areas of inquiry in the Standards, and followed the completion by each prospective juror of a questionnaire that covered an even broader range of topics. Those inquires were supplemented by additional questioning of the jurors by counsel. ██ Unless the voir dire by a court is so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair, the manner in which voir dire is conducted is not a basis for reversal. (*Mu'Min* v. *Virginia, supra,* 500 U.S. at pp. 425-426 [111 S.Ct. at pp. 1905-1906].) A fortiori, the same standard of reversible error applies when both the court and counsel participate in the voir dire. ██ After reviewing the entire voir dire of all prospective jurors, including those eventually seated, we are satisfied that the inquiry into possible racial bias was adequate to meet the demands of the Sixth and Fourteenth Amendments to the United States Constitution.

### 2. *Other Voir Dire-related Claims*

Defendant also complains that the court failed to ask that persons in one group of prospective jurors give a short biographic sketch of themselves

even though that is recommended in section 8.5(b)(20) of the Standards, gave the jurors "inconsistent" information about the role of sympathy in the guilt and penalty determinations they were to make, did not make adequate inquiry into possible media influence and gave inconsistent information regarding the obligations in that regard, did not inquire adequately about prior jury service, and sanctioned gender bias in the selection process.

Again, the claims fail to establish error, let alone reversible error. Defendant does not identify any seated juror whom he was not given the opportunity to fully examine following the voir dire by the court.

The seated jurors were properly instructed during the guilt and penalty phases of the trial regarding the role of sympathy. Assuming that the jurors may not have understood that the court was speaking only about the guilt phase in an explanation that sympathy is not a factor, the instructions were more than adequate to clear up any misapprehension caused by the court's preliminary statements to the prospective jurors. We cannot agree with defendant's assertion that general statements made during voir dire create such an indelible impression on prospective jurors that they are unable to follow specific instructions given at the time the case is submitted to the jurors for decision. Jurors are presumed to understand and follow the court's instructions. (*People* v. *Delgado* (1993) 5 Cal.4th 312, 331 [19 Cal.Rptr.2d 529, 851 P.2d 811].)

Defendant's claim that the court sanctioned gender bias is based only on the court's statement to the jury that attorneys often exercise peremptory challenges to get more men, or more women on a jury. He does not assert that the People actually exercised peremptory challenges for that reason. No objection was made on that basis and the record does not support the claim that the court actually sanctioned such use of peremptory challenges as occurred in *J.E.B.* v. *Alabama* ex rel. *T.B.*, *supra*, 511 U.S. 127 [114 S.Ct. 1419], on which he relies. There the respondent used nine of its ten peremptory challenges to remove men for a paternity and child support trial, with the result that the case was tried before an all-woman jury.

Similarly, defendant's complaint that prospective jurors were not adequately questioned regarding prior knowledge of the case is based only on an alleged failure to follow up the jurors' answers to the questionnaires they had completed to ascertain whether they had been exposed to media coverage after the time they competed those questionnaires. Again, defendant had ample opportunity to inquire into this subject during voir dire. While defendant asserts that the court failed to adequately admonish the prospective jurors to avoid media coverage of the case, the questionnaire advised them of this

responsibility. Defendant points to nothing in the record to suggest that any juror either received information from the media about the case or allowed such information to affect his or her deliberations.

The court did admonish jurors about the different burden of proof in civil and criminal cases. Defendant's complaint regarding inadequate inquiry into prior jury service is based on the court's failure to ask if the jurors could disregard what they had heard in prior criminal cases. He had full opportunity to ask that of any juror if he felt the court's voir dire was inadequate. The same is true with regard to the court's omission of questions regarding personal backgrounds in the voir dire of one of the five panels of jurors. If defendant felt the court's voir dire was inadequate, he could have probed more deeply when given the opportunity to question each prospective juror.

## IV

## GUILT PHASE CLAIMS

### A. *Failure to Make Electronic Recording of Interrogation*

Defendant claims that the trial court erred in admitting evidence of his statement to Detective Boggs. He argues that doing so violated his state and federal constitutional rights to a fair trial.

Defendant made a pretrial motion *in limine* to exclude his statement to interrogating officers from evidence, asserting that failure to tape-record the statement rendered it inadmissible on due process grounds. He argued in support of the motion that due process mandates enhanced standards of reliability in capital case fact-finding, and the recording of such statements was necessary to such reliability.

Although defendant now acknowledges that this court has rejected the argument that tape recording of statements is required to ensure fundamental fairness (*People* v. *Marshall* (1990) 50 Cal.3d 907, 924-925 [269 Cal.Rptr. 269, 790 P.2d 676]; *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 755, fn. 17 [175 Cal.Rptr. 738, 631 P.2d 446]), he asks the court to reconsider that conclusion. The argument is predicated in part on a concern that a confession may not be the voluntary "product of a rational intellect and a free will" (*Blackburn* v. *Alabama* (1960) 361 U.S. 199, 208 [80 S.Ct. 274, 280, 4 L.Ed.2d 242]), and the need to test the voluntariness of a confession on the basis of "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." (*Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 226 [93 S.Ct. 2041, 2047, 36 L.Ed.2d

854]; *People* v. *Hill* (1992) 3 Cal.4th 959, 981 [13 Cal.Rptr.2d 475, 839 P.2d 984].)

Defendant asks this court to create an exclusionary rule governing statements made during custodial interrogation. We may not do so. ▮▮▮ We are not at liberty to create rules which exclude relevant evidence that is not made inadmissible by the federal Constitution. (Cal. Const., art. I, § 28, subd. (d); *People* v. *Souza* (1994) 9 Cal.4th 224, 232 [36 Cal.Rptr.2d 569, 885 P.2d 982]; *People* v. *Crittenden* (1994) 9 Cal.4th 83, 129 [36 Cal.Rptr.2d 474, 885 P.2d 887].)

The principal authority defendant offers to support his claim that due process requires tape recording is a decision of the Alaska Supreme Court based on the due process clause of that state's Constitution. (*Stephan* v. *State* (Alaska 1985) 711 P.2d 1156. (*Stephan*).)

▮▮▮ As with defendant's preference that voir dire conform to the Standards, the fact that a particular procedure might enhance reliability does not make it one that is constitutionally mandated. The Supreme Court has squarely held that absent bad faith federal due process does not require preservation of evidence for use by the defendant. (*Arizona* v. *Youngblood* (1988) 488 U.S. 51 [109 S.Ct. 333, 102 L.Ed.2d 281]; *California* v. *Trombetta* (1984) 467 U.S. 479 [104 S.Ct. 2528, 81 L.Ed.2d 413].) As we recently observed in *People* v. *Webb* (1993) 6 Cal.4th 494, 519 [24 Cal.Rptr.2d 779, 862 P.2d 779], the Constitution mandates only that the state not destroy evidence whose exculpatory value was apparent before the destruction and which a defendant is unable to obtain from another source. Defendant offers no basis on which to conclude that article I, section 7 or 15 of the California Constitution require more in this regard than does the Fourteenth Amendment of the federal Constitution, or that statements made during custodial interrogation are not governed by article I, section 28, subdivision (d) of the California Constitution. Moreover, we are aware of nothing in the language or history of the California constitutional due process provisions which would support a construction of that charter which mandates a more stringent standard than that of the Fourteenth Amendment.

*Stephan* does not persuade us otherwise. There the court held that "an unexcused failure to electronically record a custodial interrogation conducted in a place of detention violates a suspect's rights to due process, under the Alaska Constitution, and that any statement thus obtained is generally inadmissible." (*Stephan*, *supra*, 711 P.2d at p. 1158, fns. omitted.) The court held that "recording is a requirement of state due process when the interrogation occurs in a place of detention and recording is feasible"

because recording had become a "reasonable and necessary safeguard, essential to the adequate protection of the accused's right to counsel, his right against self incrimination and, ultimately, his right to a fair trial." (*Id.* at pp. 1159-1160, fns. omitted.)

Among the recognized excuses for failing to electronically record a statement are the unavailability of a recorder, inoperative equipment, power failure, a defendant's refusal to speak if recorded, and interrogation at locations other than a place of detention. Moreover, *Stephan* does not hold that a statement that is not tape recorded is unreliable. Its rule is inapplicable "if no testimony is presented that the statement is inaccurate or was obtained improperly, apart from violation of the [taping] rule." (*Stephan, supra,* 711 P.2d at p. 1165; see also *George* v. *State* (Alaska Ct.App. 1992) 836 P.2d 960, 962 [836 P.2d 960].)[14] Manifestly, if, as defendant here argues, a statement that has not been electronically recorded is so unreliable that due process mandates its exclusion, none of these exceptions should be recognized. *Stephan* therefore is more akin to a judicially declared rule of procedure. Indeed, the Alaska recording requirement originated as a court-made rule in *Mallot* v. *State* (Alaska 1980) 608 P.2d 737, and *Stephan* enforces that rule in the same manner as other exclusionary rules created as sanctions for violation of constitutional, statutory, or judicially declared rights.

Defendant also argues that tape recording, rather than the interrogating officer's narration of his recollection of the statement, should be considered the "best evidence" of what a defendant said and that a recording is more accurate than a postinterview narration of the statement typed by the interrogating officer. He does not point to any particular part of the testimony by Detective Boggs, the interrogating officer, that was inaccurate, nor was there any motion at trial to exclude the statement because it was not the "best evidence" or was involuntary.

### B. *Miranda Advice and Waivers*

Defendant's written motion to exclude his custodial statement to Detective Boggs was based only on the failure to tape-record the statement. The People called Detective Boggs as a witness during the hearing on that motion. He was asked what rights he had advised defendant of prior to the interrogation and responded that he had advised defendant that he had the right to remain silent, that anything he said would and could be used against him in a court of law, that he had the right to have an attorney, that he had the right to have

---

[14]Defendant made no effort to satisfy this requirement. He now argues only that he was prejudiced because the jury could not hear his actual words, which were crucial in illuminating his mental state at the time of the crime.

an attorney present during any questioning, and that if he could not afford an attorney, one would be "presented" to him by the court at no cost to him. Detective Boggs also testified that he asked defendant if defendant understood those rights, defendant indicated that he did and indicated that he was willing to talk to the detective. No promises or threats were made. Detective Munoz was present during the interview and may have asked one or two questions.

After a brief cross-examination of Detective Boggs, defendant submitted the matter on the points and authorities that had accompanied the written motion. He did not argue in that motion or at the hearing that the statement was involuntary in fact or that it was elicited in violation of the requirements established by the Supreme Court in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974]. The People asserted that proper *Miranda* advice had been given and the statement was voluntary, and submitted the taping issue. The trial court ruled that the statement was voluntary beyond a reasonable doubt. Defendant was properly advised of his rights, he understood them, and he waived them.

 Defendant now argues that the *Miranda* advice was not adequate and the People failed to carry their burden of establishing that defendant's waiver was knowing and intelligent. He bases the claim that the advice was inadequate on the failure of Detective Boggs to advise defendant that an attorney would be "appointed" for him and that this would occur prior to questioning. The claim that the People failed to establish that the waiver was knowing and voluntary is based on the failure to offer evidence that defendant in fact understood the explanation of his rights and the omission to ask expressly if defendant waived those rights.

This claim was not preserved for appeal. "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear *the specific ground of the objection or motion*; . . ." (Evid. Code, § 353, italics added.) The rule requiring specificity applies to *Miranda*-based objections and motions to exclude. (*People* v. *Milner* (1988) 45 Cal.3d 227, 236 [246 Cal.Rptr. 713, 753 P.2d 669].) The reason for the rule is clear—failure to identify the specific ground of objection denies the opposing party the opportunity to offer evidence to cure the asserted defect. (*People* v. *Wright* (1990) 52 Cal.3d 367, 404 [276 Cal.Rptr. 731, 802 P.2d 221].) "While no particular form of objection is required [citation], the objection must be made in such a way as to alert the trial court to the nature of the anticipated evidence and

the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility." (*People* v. *Williams* (1988) 44 Cal.3d 883, 906 [245 Cal.Rptr. 336, 751 P.2d 395].)

 Defendant failed to specify either of the *Miranda*-based claims, or any *Miranda* claim, in his written motion or at the hearing on his motion to exclude the statement on due process grounds for failure to tape-record the statement. It is not enough, as he now argues, that at the instance of the People the court made a ruling on voluntariness. Had defendant made a proper, specific, *Miranda*-based motion, further questioning of Detective Boggs might have revealed that he misspoke when he used the term "presented" instead of "appointed," and had not failed to tell defendant that the attorney would be appointed before any questioning. He might also have offered his observations as to defendant's comprehension of the explanation of rights given to him.

Having failed to make this basis for exclusion clear either in his written motion or at the hearing on that motion, defendant has waived the right to assert error on those grounds now. Therefore we need not consider whether the advice given was adequate to "reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.' " (*Duckworth* v. *Eagan* (1989) 492 U.S. 195, 203 [109 S.Ct. 2875, 2880, 106 L.Ed.2d 166].) In the absence of any evidence of coercion or overbearing conduct by the interrogating officers, the evidence offered was unquestionably sufficient to establish that he voluntarily waived his rights. (See *People* v. *Kelly* (1990) 51 Cal.3d 931, 950 [275 Cal.Rptr. 160, 800 P.2d 516].)

C. *Sufficiency of the Evidence*

 Under the due process clauses of both the Fourteenth Amendment of the federal Constitution and article I, section 15 of the California Constitution, the test of whether evidence is sufficient to support a conviction is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson* v. *Virginia* (1979) 443 U.S. 307, 319 [99 S.Ct. 2781, 2789, 61 L.Ed.2d 560]; *People* v. *Rowland* (1992) 4 Cal.4th 238, 269 [14 Cal.Rptr.2d 377, 841 P.2d 897]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) In making this assessment the court looks to the whole record, not just the evidence favorable to the respondent to determine if the evidence supporting the verdict is substantial in light of other facts. (*People* v. *Johnson, supra*, 26 Cal.3d 557, 577; *People* v. *Basset* (1968) 69 Cal.2d 122, 138 [70 Cal.Rptr. 193, 443 P.2d 777].)

The standard of appellate review is the same when the evidence of guilt is primarily circumstantial. "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*People* v. *Bean* (1988) 46 Cal.3d 919, 932-933 [251 Cal.Rptr. 467, 760 P.2d 996]; *People* v. *Sanchez* (1995) 12 Cal.4th 1, 31 [47 Cal.Rptr.2d 843, 906 P.2d 1129]; *People* v. *Stanley* (1995) 10 Cal.4th 764, 793 [42 Cal.Rptr.2d 543, 897 P.2d 481].)

Defendant contends that the evidence does not support the jury's verdicts convicting him of rape, burglary, robbery, or murder on a theory of premeditated and deliberate murder.

1. *Rape*

 The rape conviction is challenged on the ground that the evidence failed to establish that Ms. Axtell had been raped because the element of sexual penetration was not proved. If so, the conviction on count 3 and the special circumstance of murder in the commission or attempted commission of rape would have to be set aside. We reject this claim.

Defendant does not dispute the sufficiency of the evidence to establish that some form of unlawful sexual conduct occurred. Semen on the clothing of both the victim and defendant makes that clear. Defendant relies on the laboratory analysis which found no traumatic evidence of penetration and the absence of semen in either the vagina or anus and of blood on the vaginal swabs taken during the examination performed when Ms. Axtell was transported to the hospital.

Defendant acknowledges the testimony of Dr. Farber, the emergency room physician who examined Ms. Axtell, that he observed that the vaginal area was red and that this could be consistent with either bruising and penetration by an adult penis or an infection. Dr. Farber also testified that he found no other evidence of infection. Defendant speculates that the redness could have been caused by any low-grade infection or atrophic vaginitis for which one of the medications the victim was taking is sometimes prescribed. This, coupled with the finding of apparent blood in the anus, suggested that if a sexual assault took place only sodomy occurred.

That the evidence might lead to a different verdict does not warrant a conclusion that the evidence supporting the verdict is insubstantial. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1084 [25 Cal.Rptr.2d 867, 864 P.2d 40].) The evidence of penetration in this case was circumstantial—redness in the vaginal area, the absence of evidence of an infection that might account for it, and expert testimony that the redness was consistent with penetration. Other circumstantial evidence—the medication and absence of blood or semen—could support an inference that the redness had a different cause.

When, as here, the trier of fact has relied on inferences, those inferences must be reasonable. An inference is not reasonable if it is based only on speculation. (*People v. Raley* (1992) 2 Cal.4th 870, 891 [8 Cal.Rptr.2d 678, 830 P.2d 712].) The jury verdict in this case was not, as defendant argues, based only on speculation. It was based on evidence that the redness present in the victim's vagina was consistent with penetration by an adult male penis. The inference that defendant accomplished penetration, apparently drawn by the jury on the basis of this evidence and defendant's admission that he sexually assaulted the victim, is reasonable.[15]

The evidence is sufficient under the due process guarantees of both the state and the federal Constitutions.

### 2. *Burglary*

Defendant argues that the evidence is insufficient to support the burglary conviction because it does not support an inference that, at the time he entered Ms. Axtell's residence, he intended to commit theft or any felony. He relies for this claim on his own testimony and pretrial statement that he entered the house because he "snapped" and "blew up," and his denial that he had the intent to steal or sexually assault Ms. Axtell when he did so.

The People must establish that a burglary defendant entered the premises with the intent to commit a felony or theft. Commonly, that intent must be inferred from the circumstances of the charged offense or offenses. (*People v. Cain, supra,* 10 Cal.4th at p. 47.) " 'While the existence of the specific intent charged at the time of entering a building is necessary to constitute burglary in order to sustain a conviction, this element is rarely susceptible of direct proof and must usually be inferred from all of the facts and circumstances disclosed by the evidence.' (*People v. Terry* [1962] 202 Cal.App.2d 604, 608 [20 Cal.Rptr. 915].)" (*People v. Earl* (1973) 29

---

[15]That the jury considered the rape charge and evidence with particular care is confirmed by its request that defendant's testimony, that of Dr. Farber, and the rape instructions be reread.

Cal.App.3d 894, 896 [105 Cal.Rptr. 831].) ▮▮▮ The question here is whether the evidence, including that of defendant's conduct during and after his entry, supports a reasonable inference that the intent to commit rape, sodomy, or theft existed at the time he entered the home of Ms. Axtell. We conclude that it does.

Although he contends that the question and, therefore, his answer were ambiguous, defendant admitted at trial that he intended to steal when he entered the Axtell residence. Asked what he had in mind when he opened the screen door and started into the residence, he replied that "[a]ll I knew was I was going straight for her." He then denied that he intended to sexually assault Ms. Axtell, but when asked next if he intended to steal he testified: "That was—yes . . . Yes. I knew—I didn't know what I was going to steal, but I guess that was my—I knew I was going to do something, but not necessarily what." Asked if he knew that he was going to take something from the house, he replied "[y]eah."

Even if there were some ambiguity as defendant claims over the time to which the questions about his intent to steal referred, that evidence is sufficient to support a reasonable inference that defendant intended to steal something at the time he entered the Axtell residence. In addition to his own testimony, there was sufficient circumstantial evidence of intent to steal or sexually assault Ms. Axtell to support the conviction of burglary. Defendant apparently had little or no money on the morning of the offense. He had been unsuccessful in his attempts to make sales. When he arrived at the Axtell residence he was able to see an older woman, apparently alone, resting on a couch. When he opened the screen door he immediately attempted a sexual assault on the occupant, and then forced her to go to a location where the sexual assault could not be seen and completed it. He then searched for and stole cash and jewelry. Since there appears to have been no purpose for the entry other than the sexual assault and robbery, an inference that defendant intended either or both was reasonable. ▮▮▮ " ' "When the evidence justifies a reasonable inference of felonious intent, the verdict may not be disturbed on appeal." ' " (*People* v. *Cain, supra,* 10 Cal.4th at p. 47.)

### 3. *Robbery*

▮▮▮ The same reasoning compels us to reject defendant's argument that the evidence is insufficient to support the conviction of robbery. He claims that the evidence does not establish that he intended to steal property at the time he assaulted Ms. Axtell, in that the intent did not arise until she had been subdued. Therefore, he argues, he could not be guilty of taking her property by means of force or fear, a required element of the crime of

robbery. (*People* v. *Turner* (1990) 50 Cal.3d 668, 688 [268 Cal.Rptr. 706, 789 P.2d 887].)

Robbery may also be accomplished by use of force or fear to accomplish the asportation element of the offense, however. (*People* v. *Cooper* (1991) 53 Cal.3d 1158, 1165, fn. 8 [282 Cal.Rptr. 450, 811 P.2d 742].) As discussed above, however, the evidence was sufficient to support a reasonable inference that defendant intended to steal property from Ms. Axtell and took that property by means of force. He assaulted her in order to incapacitate her and thereby facilitate the theft. That he may also have done so to facilitate the sexual assault does not compel a conclusion, as defendant argues, that the force was used only to accomplish the rape and/or sodomy.

### 4. *Murder*

The court instructed the jury on murder under both felony-murder and premeditated, deliberate murder theories. Defendant claims the evidence was insufficient to uphold the verdict on a theory of premeditated and deliberate murder. We need not consider this claim since reversal is not necessary when the court can determine from the record that the verdict rested on a theory which is supported by sufficient evidence. (*People* v. *Hernandez* (1988) 47 Cal.3d 315, 351 [253 Cal.Rptr. 199, 763 P.2d 1289]. The court can make that determination here.

The verdict convicting defendant of first degree murder was accompanied by findings on the charged special circumstances that he committed the murder in the commission of attempted robbery, rape, and sodomy. In that respect the case is indistinguishable from *Hernandez* in which the murder verdict did not indicate the theory on which the defendant was convicted, but the jury also returned special circumstances findings on rape and sodomy. (See also *People* v. *Boyd* (1985) 38 Cal.3d 762, 770 [215 Cal.Rptr. 1, 700 P.2d 782] ["Those [attempted-robbery special-circumstance] findings make it clear that whatever the jurors thought about premeditation, they agreed upon all of the elements necessary for a verdict of first degree murder based on a felony-murder theory. Consequently, any error in instructing on premeditation could not have prejudiced defendant."].)

### D. *Adequacy of Allegations Charging Burglary*

Although the third count of the amended felony complaint charged defendant with the commission of burglary by entry into the residence of Ms. Axtell "with the intent then and there to commit the crimes of theft and rape," the fifth count of the information alleged only that the entry was "with

the intent . . . to commit the crimes of theft or a felony." On this basis, defendant claims that he was denied adequate notice of the intended offense or offenses the prosecution sought to prove as the predicate for the burglary charge, and that the court's subsequent instruction that burglary could be based on intent to commit theft, rape, or sodomy, therefore expanded the charge of which he had notice and denied him the right to a fair trial guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and article I, sections 7 and 16 of the California Constitution.

The information charged the intent element of burglary in language conforming to section 459, which states that element as "intent to commit grand or petit larceny *or any felony*." (Italics added.) Defendant did not demur to the information as he might have done if he believed that this language failed to state the offense adequately to give him notice. (§§ 1004, subd. 2, 952.) The well-established rule is that failure to demur on the ground that a charging allegation is not sufficiently definite waives any objection to the sufficiency of the information. (*People* v. *Ellenwood* (1897) 119 Cal. 166 [51 P. 553]; *People* v. *Polowicz* (1992) 5 Cal.App.4th 1082 [7 Cal.Rptr.2d 640].) Counsel's failure to object may well be explained by another established rule: "Notice of the particular circumstances of the offense is given not by detailed pleading but by the transcript of the evidence before the committing magistrate . . . ." (*People* v. *Roberts* (1953) 40 Cal.2d 483, 486 [254 P.2d 501]; see also *People* v. *Thomas* (1987) 43 Cal.3d 818, 829 [239 Cal.Rptr. 307, 740 P.2d 419].)

Defendant also failed to object to the court's preliminary or final instructions, both of which included entry with intent to commit sodomy as a possible basis for conviction of burglary. The court's preliminary instructions advised the jury that intent to "commit the crime of rape or sodomy, or . . . to steal" were elements that had to exist for a conviction of burglary in this case and when the final instructions were discussed with counsel they agreed that the court would include "a specific intent to steal or to commit robbery or rape or sodomy" in the burglary instruction. When given the opportunity to object to the final guilt phase instructions, defendant's counsel said he had no objections.[16]

Finally, defendant had notice both from the evidence offered at the preliminary hearing and the other offenses charged in the information that an

---

[16]Apparently the final guilt phase instructions were discussed in chambers on the afternoon of April 12, 1990, after the People announced that there would be no rebuttal. When the court recessed for the noon hour prior to that discussion the judge noted that "in the event that there are any objections or anything to put on the record as to the instructions, we can do that first thing Monday morning." As we noted above, defendant's counsel made no objection to the final guilt phase instructions when given the opportunity to do so. The only comment when the court stated that intent to steal or to commit robbery or rape or sodomy would be included

intent to commit any of those offenses might be relied upon as the predicate for burglary. The record thus refutes defendant's claim that he was somehow prejudiced by the manner in which the information charged burglary.

### E. *Instructions*

#### 1. *Lesser Included Offenses*

##### a. *Rape and sodomy*

Defendant contends that the trial court erred in failing to instruct the jury sua sponte on attempted rape (§§ 664/261), assault with intent to commit rape (§ 220), assault (§ 240), and battery (§ 242), all of which he claims are lesser included offenses of rape by means of force or fear, and on assault with intent to commit sodomy, attempted sodomy, assault, and battery as offenses included in sodomy.

Relying on *Beck* v. *Alabama* (1989) 447 U.S. 625 [100 S.Ct. 2382, 65 L.Ed.2d 392] (*Beck*), and *People* v. *Geiger* (1984) 35 Cal.3d 510 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055] (*Geiger*), he contends that such instructions are an incident of due process. Absent instructions on lesser included offenses, the all-or-nothing choice given the jury creates impermissible pressure to convict.

*Beck* seeks to " 'eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence.' " (*Schad* v. *Arizona* (1991) 501 U.S. 624, 646-647 [111 S.Ct. 2491, 2504-2505, 115 L.Ed.2d 555].) When jury instructions were discussed before trial in this case and the court indicated that an instruction defining attempt would have to be given, defendant objected. That objection appears to have been directed to any instruction on lesser included offenses.[17] Even were this not so, defendant concedes that the duty to instruct on lesser offenses exists only if there is evidence that the offense was less than that charged. (*People* v. *Ghent, supra*, 43 Cal.3d 739, 757; *People* v. *Sedeno*

---

in the burglary instruction was from the prosecutor who stated that the instruction should refer only to "rape or sodomy."

[17]After the judge read the numbers of the CALJIC instructions he planned to give, the judge stated that No. 6.00, defining attempt, would have to be included. This colloquy between the court and defense counsel followed:

"MR. SORIA: Your Honor, as the court recalls, the defense is objecting to that instruction at this time.

"THE COURT: What's the point?

"MR. SORIA: Just registering an objection your honor.

"THE COURT: Well, are you objecting to the—

"MR. SORIA: Lesser included, your Honor, I believe is our position.

(1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913].) For that reason there was no error in failing to instruct on assault with intent to commit rape or attempted rape.

An assault with intent to commit rape is a form of attempted rape. (*People v. Ghent, supra,* 43 Cal.3d at p. 757.) There was no evidence that defendant intended to commit rape but was unsuccessful in the attempt. He admitted a sexual assault on Ms. Axtell during which he committed sodomy and in so doing may have committed an assault[18] and a battery.[19] He denied raping the victim. There was no evidence of a separate assault or battery during an unsuccessful attempt to commit rape.[20] This is not a case like *Beck* or *Geiger* in which the jury may have felt undue pressure to convict defendant of rape rather than acquit him because the evidence suggested to the jury that he committed some form of sexual assault, but was not sufficient to satisfy the jury beyond a reasonable doubt that the offense was rape.

The same reasoning leads us to reject the claim that instructions on offenses included within sodomy were necessary. Defendant admitted committing sodomy. His claim that he did not penetrate both the vagina and the anus was a denial of rape and did not, as defendant argues, raise an issue as to whether he committed sodomy.[21] There was no evidence from which the jury could have concluded that he committed an assault on Ms. Axtell with the intent to commit sodomy, but was unsuccessful in the attempt.

"THE COURT: Are you objecting to it because you don't want lesser included or are you objecting to the special circumstances of—in each case of saying that in the commission or attempted commission or rape, commission of or attempted commission of robbery, in the commission or attempted commission or robbery [*sic*], or commission or attempted commission of sodomy?

"MR. SORIA: Your Honor, I think we will take—defense at this point will take the broadest objection which will include the special circumstances of commission and attempted commission of the specific crimes. That will be our position at this point."

The parties and the court agreed that the court would have to hear the evidence before ruling, and that the instructions would be discussed again. Defendant does not indicate that he changed his position or withdrew his objection to instructions on lesser included offenses at any later time, however. When the final jury instructions were discussed, and the court asked if there were any objections that counsel wanted to put on the record, defendant's attorney stated that everything that was objected to had been withdrawn.

[18]Section 240: "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."

[19]Section 242: "A battery is any willful and unlawful use of force or violence upon the person of another."

[20]Section 664: "Every person who attempts to commit any crime, but fails, or is prevented or intercepted in the perpetration thereof, is punishable . . . ."

[21]Defendant testified at trial: "Well, I got behind her, and I pulled down my pants and my shorts, and I proceeded as far as penetrating from the—from the rear end. And it was—it was anal." In his pretrial statement he admitted making penetration and ejaculation, but said he did not know whether the penetration was anal or vaginal.

### b. *Robbery*

 Defendant also claims that the court erred in failing to instruct sua sponte on theft, an offense necessarily included in robbery, because the intent to steal could have arisen after the assault on Ms. Axtell. We do not agree. It is true as we have noted above that when the intent to steal arises only after the victim is assaulted and neither force nor fear is used to accomplish the taking or escape with the property, the offense is theft, not robbery. (§ 211; *People* v. *Kelly, supra*, 1 Cal.4th 495, 528; *People* v. *Webster* (1991) 54 Cal.3d 411, 443 [285 Cal.Rptr. 31, 814 P.2d 1273].) If there is substantial evidence that an element of an offense is missing, the court must instruct sua sponte on the lesser included offense. (*People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 127 [2 Cal.Rptr.2d 335, 820 P.2d 559], judg. vacated and cause remanded (1992) 506 U.S. 802 [113 S.Ct. 32, 121 L.Ed.2d 5], reaffirmed (1993) 6 Cal.4th 457 [24 Cal.Rptr.2d 808, 862 P.2d 808]; *People* v. *Webster, supra*, at p. 443.)

Here, however, there was no substantial evidence from which the jury could have concluded that the offense was less than robbery. As discussed above, defendant admitted an intent to steal and the evidence established that he assaulted Ms. Axtell in order to subdue her for that purpose. He denied intent to commit a sexual offense, but admitted that when he assaulted Ms. Axtell he intended to steal her property. There was no substantial evidence from which the jury could have inferred that defendant's intent to steal arose only after Ms. Axtell had been subdued.

It is irrelevant in the circumstances of this case that some property was taken from the kitchen. Contrary to defendant's argument, the property taken in the kitchen was taken from "her immediate presence" since the kitchen was in an area over which Ms. Axtell had control until defendant subdued her. "The zone of immediate presence includes the area 'within which the victim could reasonably be expected to exercise some physical control over his property.'" (*People* v. *Webster, supra*, 54 Cal.3d at p. 440.)

### 2. *Failure to Define "Sexual Intercourse"*

 Defendant next contends that, because "intercourse" does not have a common meaning and is a technical term, the failure of the court to define "sexual intercourse" resulted in a failure to instruct on all elements of the offense of rape.[22] The instructions, he argues, did not inform the jury that the penetration required was penetration of the vagina and the jury might have

---

[22]The court instructed: "In order to prove [the crime of rape] each of the following elements must be proved:

believed that anal penetration was sufficient. We see no possibility that the jury did not understand the instructions to require vaginal penetration.

We disagree with defendant that "sexual intercourse" is a technical term with various meanings and might be misunderstood when used in a definition of rape. In this state rape and sodomy are distinct crimes. There is no reason to think that a California juror, instructed on the elements of each crime, would understand the term "intercourse" or "sexual intercourse" in the instruction on rape to refer to anal intercourse. In this case, the instruction defining rape for the jury was followed immediately by the definition of sodomy, which specified that the sexual penetration in that offense must be penetration of the anus of the victim. Later, in response to the question of a juror who asked if the offense was rape if the victim removed her own clothes, the court again instructed on the elements of rape and added: "[A]ny penetration of the male sex organ into the female sex organ, however, slight, constitutes an engaging in an act of sexual intercourse."

The instructions were placed in context by the parties' closing arguments, which preceded these instructions. The prosecutor advised the jury that an act of sexual intercourse was an element which had to be proved to establish the crime of rape. He then explained that "[a]ny sexual penetration of the vagina, any penetration of the penis, however slight, constitutes an act of engaging in an act of intercourse" and that "[t]he only issue that exists at all as to the crime of rape is was there actual vaginal sexual intercourse."

In his closing argument defense counsel conceded that, based on defendant's testimony, the jury would have to find that he sodomized Ms. Axtell. He argued, however, that defendant "never entered the vagina, . . . Therefore, rape is not present here."

We agree with the People that there is no possibility that the jury did not understand that in the court's instruction on rape, the intercourse to which the instruction referred required penetration of the victim's vaginal genitalia.

### 3. *Possession of Recently Stolen Property*

 The court instructed the jury in the language of CALJIC No. 2.15 that: "If you find that a defendant was in conscious possession of recently

---

"One, a male and female person engaged in an act of sexual intercourse;
"Two, the persons were not married to each other;
"Three, the act of intercourse was against the will of the female person; and
"Four, such act was accomplished by means of force, violence or fear of immediate and unlawful bodily injury to such person.
"Any sexual penetration, however slight, constitutes engaging in an act of sexual intercourse. Proof of ejaculation is not required."

stolen property, the fact of such possession is not by itself sufficient to permit an inference that the defendant is guilty of the crimes of burglary or robbery. Before guilt may be inferred, there must be corroborating evidence tending to prove defendant's guilt. However, this corroborating evidence need only be slight, and need not by itself be sufficient to warrant an inference of guilt."

Defendant claims that notwithstanding the express admonition that possession alone is insufficient to warrant a conviction of robbery or burglary, this instruction in effect tells the jury that such evidence, if corroborated, is sufficient. The instruction, he contends, permits an inference or presumption based on insufficient foundational facts and thereby violates a defendant's rights under the Sixth, Eighth and Fourteenth Amendments. To meet constitutional requirements there must be "substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend." (*Leary* v. *United States* (1969) 395 U.S. 6, 36 [89 S.Ct. 1532, 1548, 23 L.Ed.2d 57], fn. omitted.)

The court rejected a similar argument directed to CALJIC No. 2.15 in *People* v. *Johnson* (1993) 6 Cal.4th 1, 36-38 [23 Cal.Rptr.2d 593, 859 P.2d 673]. The corroborating evidence here was sufficient to permit the jury to find the inferred fact—intent to steal at the time of entry—beyond a reasonable doubt. The court did not err in giving the instruction.

Moreover, instructions are not considered in isolation. Whether instructions are correct and adequate is determined by consideration of the entire charge to the jury. (*People* v. *Wilson* (1992) 3 Cal.4th 926, 943 [13 Cal.Rptr.2d 259, 838 P.2d 1212].) The jury was advised that the instructions were to be considered as a whole and each in the light of all of the others. It was also instructed on all of the required elements of burglary and robbery and was expressly told that in order to prove those crimes, each of the elements must be proved. We see no possibility that giving the jury the additional admonition that it could not rely solely on evidence that defendant possessed recently stolen property would be understood by the jury as suggesting that it need not find all of the statutory elements of burglary and robbery had been proven beyond a reasonable doubt. Indeed, where identity of a perpetrator is in dispute or sought to be proved by circumstantial evidence, CALJIC No. 2.15 protects the defendant from unwarranted inferences of guilt based solely on possession of property stolen in the charged offense. Defendant's effort to persuade us that the instruction does otherwise, an effort based on something the instruction does not state, fails.

#### 4. *False Statements Reflecting Consciousness of Guilt*

 The court instructed the jury in the language of CALJIC No. 2.03: "If you find before this trial the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt; however, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination."

Extending the reasoning under which he claimed that CALJIC No. 2.15 should not have been given, defendant claims that this instruction is also constitutionally deficient. He concedes that false statements may show consciousness of guilt and that this court has held that a jury may rationally infer that false statements about a crime reflect consciousness of guilt of all offenses that were "committed" during a single attack. (*People* v. *Griffin* (1988) 46 Cal.3d 1011, 1027 [251 Cal.Rptr. 643, 761 P.2d 103].) He argues, however, that the jury may misunderstand the instruction to permit an inference that false statements about one crime reflect consciousness of guilt not only of other crimes the defendant has committed, but also of other crimes that are charged. Seizing on the word "committed" in *Griffin*, defendant argues that the instruction should be modified to advise the jury that such statements may be considered a circumstance tending to prove "consciousness of guilt concerning only those crimes that you find beyond a reasonable doubt were committed." Without that modification, defendant argues, the jury here could have considered his false statements about other crimes to reflect consciousness of guilt of rape even though the jury had not determined that a rape had been committed.

The instruction was not misleading. In *People* v. *Rodrigues* (1994) 8 Cal.4th 1060, 1140 [36 Cal.Rptr.2d 235, 885 P.2d 1], we held that the jury could reasonably have drawn inferences that false statements about an arm injury "tended to show consciousness of guilt of *all* the *charged* crimes." (Second italics added.) Neither our use of the word "committed" in *People* v. *Griffin*, *supra*, 46 Cal.3d 1011, 1027, nor our use of the word "charged" in *Rodrigues* reflects concern that the instruction may be understood to permit the jury to infer that the defendant's false statements about one offense may be a basis for concluding that the statement reflects consciousness of guilt of a crime that has not been committed. CALJIC No. 2.03 expressly admonishes the jury that false statements about charged crimes alone are not sufficient to prove guilt.

### 5. *Mandatory Presumptions*

#### a. *Reasonable interpretation of the evidence*

 Defendant next claims that instructions which tell the jury that it must accept a reasonable interpretation of the evidence over an unreasonable interpretation create a mandatory presumption which impermissibly lessens the People's burden of proof.[23] Such an instruction does so, he claims, because it dictates the interpretation of evidence that must be accepted "regardless of the juror's opinion concerning the truth or falsity of either the reasonable or unreasonable interpretation." Defendant concedes that we have rejected this argument (see *People* v. *Crittenden, supra,* 9 Cal.4th at p. 144), but urges us to reconsider the question.

We see no need to do so. The instruction does not mandate that a juror accept what he or she believes is a false interpretation of the evidence simply because that interpretation of the evidence may seem reasonable to some persons, and does not mandate that a juror find a defendant guilty on the basis of a false or erroneous interpretation of the evidence. An instruction that a reasonable interpretation be accepted over an unreasonable interpretation is simply not susceptible to the understanding defendant posits. A juror who believes that a particular interpretation of evidence is false is not likely to believe that the false interpretation is reasonable, and certainly would not believe that the false interpretation establishes guilt beyond a reasonable doubt.

Further, advising a jury that it must accept a reasonable interpretation of the evidence over one that is unreasonable is not comparable to the type of mandatory presumption struck down by the United States Supreme Court in *Sandstrom* v. *Montana* (1979) 442 U.S. 510, 523-524 [99 S.Ct. 2450, 2458-2459, 61 L.Ed.2d 39], on which defendant relies. There, in a case in which the defendant was charged with "deliberate homicide," the jury was instructed that " '[t]he law presumes that a person intends the ordinary consequences of his voluntary acts.' " (*Id.* at p. 517 [99 S.Ct. at p. 2445, italics omitted.) The impact of that instruction was to relieve the State of Montana of the necessity of proving every element of the crime, i.e., that the defendant acted knowingly or purposefully, and could have had the effect of shifting the burden to the defendant to prove the absence of those elements. Instructing the jury to accept what it believes is a reasonable interpretation of the evidence cannot have that effect.

---

[23]This argument is directed to CALJIC Nos. 2.01, 2.02, 8.83, and 8.83.1, all of which were given.

### b. *Burglary instruction*

The burglary instruction advised the jury consistent with CALJIC No. 14.59 that: "If you are satisfied beyond a reasonable doubt and agree unanimously that the defendant made an entry with the specific intent to steal or commit rape or sodomy, felonies, *you should find the defendant guilty.* You are not required to agree as to which particular crime the defendant intended to commit when he entered." (Italics added.)

Defendant complains that the emphasized words created a mandatory presumption that he was guilty of all of the charged crimes. Even without consideration of the instructions on the other charged offenses, each of which advised the jury of all of the elements of the crimes and that each element had to be proven, the claim lacks merit. The burglary instructions themselves made it clear that this language referred only to defendant's guilt of burglary.

V

SPECIAL CIRCUMSTANCES ISSUES

### A. *Sufficiency of the Evidence*

Since we have rejected defendant's claims that the convictions for burglary, robbery, rape, and sodomy are not supported by sufficient evidence, his claim that the special circumstance findings based on the same evidence must also be set aside is also rejected.

### B. *Instructions*

 Defendant also claims that the court did not properly describe the special circumstances when it instructed the jury that if the defendant was convicted of murder in the first degree "you must then determine if one or more of the following special circumstances are true or not true: robbery, burglary, rape or sodomy." The error, he claims, is in failing to explain in the introductory instruction (CALJIC No. 8.80) that the substantive crimes and the special circumstances differed since, for the latter allegations to be found true, the jury was required to find that the murder was committed "during the commission" of one or more of the underlying crimes. This error assertedly was compounded when the court included all four substantive offenses in the subsequent instruction (CALJIC No. 8.81.17) instead of giving a separate instruction based on each substantive offense. We disagree. The instructions, read together, properly stated the law.

The jury was first instructed: "If you find the defendant in this case guilty of murder of the first degree, you must then determine if one or more of the following special circumstances are true or not true: robbery, burglary rape or sodomy."

The court then told the jury that "you must decide separately each special circumstance alleged in this case" and explained what was necessary to determine if the "following" special circumstances were true or not true: "To find that the special circumstance, referred to in these instructions as murder in the commission of rape, robbery, burglary or sodomy is true, it must be proved: [one], the murder was committed while the defendant was engaged in the commission of a rape, robbery, burglary or sodomy; two, the murder was committed to carry out or advance the commission of the crimes of rape, robbery, burglary or sodomy. In other words, the special circumstance referred to in these instructions is not established if the crimes enumerated were merely incidental to the commission of murder."

It is clear from this that the jury was expressly told that there were four special circumstances, each of which had to be separately considered, and that to be found true each special circumstance required finding that the murder was committed while the defendant was engaged in the commission of the particular underlying crime. The instruction also required the jury to find that the murder was committed to further the underlying crime.

## C. *Separate Findings*

 Defendant claims next that section 190.2 permits only one felony-murder special-circumstance finding under subdivision (a)(17) (section 190.2(a)(17)). He relies by analogy on *People* v. *Allen* (1986) 42 Cal.3d 1222, 1273 [232 Cal.Rptr. 849, 729 P.2d 115], in which we held that, regardless of the number of murders of which a defendant is convicted, under section 190.2, subdivision (a)(3), there can be only one multiple-murder special circumstance.

At the time of defendant's offenses, former section 190.2 provided in pertinent part: "(a) The penalty for a defendant found guilty of murder in the first degree shall be death or confinement in state prison for a term of life without the possibility of parole in any case in which one or more of the following special circumstances has been charged and specially found under Section 190.4, to be true: [¶] . . . [¶] (17) The murder was committed while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit the following felonies: . . ."

Rape, robbery, sodomy, and burglary are among the listed felonies. Defendant contends that the "one or more special circumstances" language of the introductory paragraph permits separate special-circumstance allegations and findings for each of the 19 categories of murders listed in section 190.2, subdivision (a), but that paragraph (17), under subdivision (a) defines a single category of felony murder and will support only a single special-circumstance finding regardless of the number of listed felonies in which the defendant was engaged at the time of the commission of the murder.

We do not agree. Only a strained construction of the language of this section would support a conclusion that section 190.2(a)(17) permits only one special circumstance finding regardless of the number of felonies in which a defendant was engaged at the time of a murder. Unlike the multiple-murder special circumstance considered in *People* v. *Allen, supra,* 42 Cal.3d 1222, the felony-murder special circumstance does not rely on the same offense for each special circumstance charged. Separate special circumstance findings based on separate underlying felonies do not, therefore, create a risk of arbitrary imposition of the death penalty based on the number of special circumstances rather than the conduct underlying each.

The 1978 law has been amended by the Legislature and reenacted by the electorate during this period without any change in section 190.2(a)(17) that would suggest an intent that section 190.2, subdivision (a)(17) be restricted in the manner suggested by defendant. Even assuming arguendo that the original measure may have been susceptible to the construction suggested by defendant, the failure of the electorate to change the law to conform to that intent implies acquiescence in the construction uniformly followed by both prosecutors and the courts over the past 20 years and an intent that the statute continue to be construed as it was prior to the amendments and reenactment. (*Smith* v. *Fair Employment & Housing Com.* (1996) 12 Cal.4th 1143, 1158 [51 Cal.Rptr.2d 700, 913 P.2d 909]; *People* v. *Bouzas (1991)* 53 Cal.3d 467, 475 [279 Cal.Rptr. 847, 807 P.2d 1076].)

VI

PENALTY-RELATED ISSUES

A. *Instructional Error*

1. *Resolving Factual Disputes*

Defendant claims that the court failed to instruct the jury on the standard by which factual disputes at the penalty phase are to be resolved.

He recognizes that neither the prosecution nor the defense has the burden of proof (*People* v. *Daniels* (1991) 52 Cal.3d 815, 890 [277 Cal.Rptr. 122, 802 P.2d 906]), and that the jury need not be persuaded beyond a reasonable doubt that death is the appropriate penalty. (*People* v. *Cudjo* (1993) 6 Cal.4th 585, 634 [25 Cal.Rptr.2d 390, 863 P.2d 635].) He argues, however, that this does not relieve the court of the obligation to instruct sua sponte on the standard for resolving factual disputes as to the existence of aggravating and mitigating factors and on the burden of proof of those factors; in particular, that the People bear the burden of proof of the existence of aggravating factors. (See Evid. Code, §§ 115, 500, 502.) Absent such instructions, he contends, there is no safeguard against bias and caprice in the sentencing process, with the result that his rights under the due process clause of the Fourteenth Amendment were violated and the penalty verdict rendered unreliable in violation of the Eighth Amendment.

Defendant relies for his argument that the standard penalty phase instructions are inadequate on Evidence Code section 502, and an isolated statement taken out of context from *Walton* v. *Arizona* (1990) 497 U.S. 639, 653 [110 S.Ct. 3047, 3057, 111 L.Ed.2d 511], where the court said: "When a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process." That statement was made by the court in *Walton* when it rejected the defendant's claim that one of two Arizona aggravating factors underlying the death penalty—that the murder was committed in an especially heinous, cruel or depraved manner—failed to channel the sentencer's discretion. The aggravating factor had been given a narrowing construction by the Arizona Supreme Court, however, limiting its application to murders in which the killer inflicted mental anguish or physical abuse on the victim before the killing. In Arizona the jury was not the final sentencer. The court conducted the sentencing hearing and sentenced the defendant to death. The Arizona Supreme Court had found the evidence sufficient to support the aggravating factor under the narrowing construction.

The quoted sentence on which defendant relies was used by the court in distinguishing the Arizona case before it from cases in which a jury that was the final sentencer had not been given a constitutionally adequate narrowing definition of a similarly worded aggravating factor. The court was not addressing instructions on the burden or quantum of proof. It applied the presumption that judges know the law, presumed that the sentencing court had applied the narrower definition of the aggravating factor, and affirmed the judgment.

Evidence Code section 502, on which defendant also relies, provides: "The court on all proper occasions shall instruct the jury as to which party

bears the burden of proof on each issue and as to whether that burden requires that a party raise a reasonable doubt concerning the existence or nonexistence of a fact or that he establish the existence or nonexistence of a fact by a preponderance of the evidence, by clear and convincing proof, or by proof beyond a reasonable doubt."

In *People* v. *Rodrigues, supra*, 8 Cal.4th at pages 1190-1191, the court rejected a claim similar to that of defendant here. There the defendant claimed that a failure to instruct pursuant to CALJIC No. 2.90, a guilt phase instruction that was also given here that: "A defendant in a criminal action is presumed to be innocent until the contrary is proved. In case of a reasonable doubt whether the truth of an allegation is satisfactorily shown, he is entitled to a finding of not guilty. This presumption places upon the state the burden of proving the truth of any allegation beyond a reasonable doubt."

We held in *Rodrigues, supra*, 8 Cal.4th at pages 1190-1191, that there is no statutory or constitutional duty to instruct on the prosecutorial burden at the penalty phase of a capital trial. There, as here, the jury had been instructed that evidence of unadjudicated offenses is subject to the reasonable doubt standard. We concluded that no more was required.

It is evident to any reasonable penalty phase jury that it is the People who are offering or identifying what they characterize as aggravating evidence and making an argument geared to persuade the jury that the aggravating factors outweigh the mitigating factors and that, as a result, death is the appropriate penalty. The jury is also aware that the defendant is offering what he believes to be sufficient mitigating evidence to persuade the jury that life without parole is appropriate.[24]

As we explained in *People* v. *Carpenter* (1997) 15 Cal.4th 312, 417 [63 Cal.Rptr.2d 1, 935 P.2d 708], and *People* v. *Bonillas* (1989) 48 Cal.3d 757, 790 [257 Cal.Rptr. 895, 771 P.2d 844], because capital sentencing is a moral and normative process, it is not necessary to give instructions associated with the usual factfinding process. The court did not err, therefore, in failing to instruct on the standard of proof for resolution of factual disputes at the penalty phase.

---

[24]In this case, after an extensive review of the relationship of the evidence to the statutory aggravating and mitigating factors, the prosecutor closed his penalty phase argument as follows: "The crime [defendant] committed, the evidence in aggravation weighed against the evidence in mitigation substantially outweighing it, morally justifies the imposition of the death penalty for the murder of Marie Axtell. Death is the appropriate punishment."

Defendant's counsel then explained that he spoke last because the law favors life, and that when first assigned he knew he was going to address 12 people for the defendant's life. Then, after recounting the mitigating evidence, he ended by asking for the defendant's life.

### 2. *Proof of Other Criminal Activity*

 Defendant contends that the court's instruction that other crimes urged as aggravating factors (§ 190.3, factor (b)) must be proven beyond a reasonable doubt was constitutionally defective because the court did not define reasonable doubt.[25]

Although the court had defined "reasonable doubt" in the guilt phase instructions,[26] defendant claims that a penalty phase instruction to disregard guilt phase instructions left the jury without an adequate understanding of the People's burden of proof, and, in any event, we should not assume that the jury would recall the guilt phase instruction given two weeks earlier. The error, he claims, undermines the reliability of the penalty phase decision in violation of the Eighth Amendment of the federal Constitution and violated article I, sections 7, 16, and 17 of the California Constitution.

Any possible error arising from the court's failure to redefine reasonable doubt was harmless. Having been correctly instructed at the guilt phase on the meaning of reasonable doubt, the jury would not be confused or uncertain regarding the term when resolving a factual issue to which that standard applied at the penalty phase. We note that the jury did not request a further explanation of the reasonable doubt standard, as it surely would have done had it been confused as to the meaning of reasonable doubt.

### 3. *Mitigating Evidence*

Defendant contends that the court erred in failing to instruct, sua sponte, that unanimity is not required for mitigating evidence. Each juror may individually decide each question relevant to the penalty decision. (See *People* v. *Breaux* (1991) 1 Cal.4th 281, 314 [3 Cal.Rptr.2d 81, 821 P.2d

---

[25]The court instructed: "Evidence has been introduced for the purpose of showing that the defendant has been convicted of the crime of burglary in the State of Colorado prior to [the] offense of murder in the first degree of which he has been found guilty in this case. Before you may consider such alleged crime as an aggravating circumstance in this case, you must first be satisfied beyond a reasonable doubt that the defendant was in fact convicted of such prior crimes."

The court gave a similar instruction regarding the evidence of rape and robbery, again advising that before those acts could be considered aggravating circumstances "a juror must first be satisfied beyond a reasonable doubt that the defendant did in fact commit such criminal acts."

[26]That instruction advised: "Reasonable doubt is defined as follows. It is not a mere possible doubt, because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge."

585].) The jury was instructed in the language of CALJIC No. 8.87 that it was not necessary for all jurors to agree on evidence of other criminal activity, but no similar instruction was given on mitigating evidence. Defendant reasons that this might lead the jurors to infer that unanimity was required on that evidence. Again, however, he failed to request such an instruction, and we do not believe that any juror would draw the suggested inference because the court also instructed: "Do not conclude that because an instruction has been given that I am expressing an opinion as to the facts. The People and the defendant are entitled to the *individual opinion* of each juror. Each of you must consider the evidence for the purpose of reaching a verdict, if you can do so. *Each of you must decide the case for yourself*, but you should do so only after discussing the evidence and instructions with the other jurors." (Italics added.) Those instructions adequately informed the jury that resolution of penalty phase factual questions as well as deciding the appropriate penalty was an individual responsibility.

### 4. *Nonviolent Criminal Acts*

The court instructed the jury on "factor (b)" (§ 190.3, factor (b)) as a circumstance to be considered in deciding the appropriate penalty. The instruction described the factor in statutory language as: "The presence or absence of criminal activity by the defendant other than the crimes for which the defendant has been tried in the present proceedings which *involve the use or attempted use of force or violence or the express or implied threat to use such force or violence*." (Italics added.) It also instructed the jury that evidence had been introduced to show that defendant had been convicted of burglary in Colorado and had committed the Colorado rape and robbery "which involve the express or implied use of force or violence" and that "[a] juror may not consider any evidence of any other criminal acts as an aggravating circumstance except as instructed before in these instructions."

Defendant argues that, notwithstanding these instructions limiting consideration of other crimes evidence, the instructions impliedly invited the jurors to consider his juvenile crimes and other nonviolent acts as aggravating circumstances. We do not agree that these instructions had that effect. Moreover, the evidence of nonviolent juvenile misconduct and other criminal acts was introduced by defendant and he did not request a limiting instruction. Therefore, he may not complain now that the jury may have disregarded instructions which correctly restricted consideration of other crimes evidence to felony convictions and crimes involving force or violence. (*People* v. *Visciotti, supra,* 2 Cal.4th 1, 72; *People* v. *Williams, supra,* 44 Cal.3d 883, 957.)

### 5. *Bias*

The jury was instructed that "[y]ou must neither be influenced by bias nor prejudice against the defendant nor be swayed by public opinion or public feelings." Defendant contends that the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.) (the ADA) mandates an additional or expanded instruction that the jury should not be biased against him because of his disabilities, including his brain injury, epilepsy, and learning disabilities. The ADA was enacted on July 26, 1990, however, after the trial of this case. The instruction that the jury should not be biased against defendant was adequate.

### 6. *Failure to Testify at Penalty Phase*

Defendant also asserts error in failing to instruct the jurors that they should draw no adverse inference from his failure to testify at the penalty phase of the trial. He claims that his pretrial request that CALJIC No. 2.60 be given was not restricted to the guilt phase. He acknowledges, however, that penalty phase instructions were separately submitted and that he did not request general instructions. He argues that the instruction should have been given sua sponte by the trial court as one governed by the rule that trial courts must "instruct *sua sponte* on those general principles of law which are closely and openly connective with the facts and are necessary for the jury's understanding of the case." (*People* v. *Vann* (1974) 12 Cal.3d 220, 226 [115 Cal.Rptr. 352, 524 P.2d 824].) He recognizes that we have rejected this argument (see *People* v. *Hardy* (1992) 2 Cal.4th 86, 209 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *People* v. *Morales* (1989) 48 Cal.3d 527, 569-570 [257 Cal.Rptr. 64, 770 P.2d 244]), but argues that absent the instruction the jury lacks sufficient guidance and is improperly permitted "to draw from the defendant's silence broad inferences of guilt." (*Carter* v. *Kentucky* (1981) 450 U.S. 288, 301 [101 S.Ct. 1112, 1119, 67 L.Ed.2d 241].)

As we recognized in *People* v. *Morales, supra,* 48 Cal.3d at page 570, however, this instruction may remind the jury that a defendant has not testified. Because a defendant may have a sound tactical reason for preferring that the instruction not be given, it need not be given sua sponte at the guilt phase (*People* v. *Preston* (1973) 9 Cal.3d 308, 316 [107 Cal.Rptr. 300, 508 P.2d 300]), and even when the court has given the instruction at the guilt phase it need not repeat the instruction sua sponte at the penalty phase of a capital case. (*People* v. *Morales, supra,* 48 Cal.3d at p. 570.)

### 7. *Life Without Possibility of Parole*

The trial court instructed the jury at the beginning of the penalty phase instructions that the "penalty for a defendant found guilty of murder of

the first degree shall be death or confinement in the state prison for life without possibility of parole in any case in which the special circumstances alleged in this case have been specially found to be true." Later, after most of the general penalty phase instructions had been given, the court instructed: "It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on the defendant."

Defendant claims that the court erred in failing to instruct the jury, sua sponte, on the meaning of the sentencing alternative "life without the possibility of parole." He contends that this, too, is a technical term with a peculiar meaning in law on which the court must instruct with its duty to instruct sua sponte on general principles which are closely and openly connected with the facts before the court. Therefore, he argues, the jury must be informed about the real consequences of their sentencing options.

Defendant acknowledges that we have rejected the claim that the term has a technical meaning which requires a sua sponte definitional instruction. (*People* v. *Bonin* (1988) 46 Cal.3d 659, 698 [250 Cal.Rptr. 687, 758 P.2d 1217].) His attempt to demonstrate that *Bonin* is unsound fails.

Defendant reasons that there is confusion regarding the meaning of life without possibility of parole because persons sentenced to life terms are eligible for parole and some persons on whom a sentence of life without possibility of parole had been imposed under prior death penalty laws have been paroled when the law was invalidated and their sentence modified to life imprisonment. He claims that jurors also are aware that some notorious convicted murderers are eligible for parole. None of this supports defendant's argument that the term life without the possibility of parole has a meaning peculiar to the law. A sentence of life imprisonment is not life without possibility of parole. The invalidation of a law, leading to modification of a term, does not affect that plain meaning of life without the possibility of parole.

An instruction, such as that proposed by defendant, advising the jury that a defendant could never be released on parole if sentenced to life without the possibility of parole would be erroneous, since gubernatorial pardon and/or commutation of the sentence is permitted (Cal. Const., art. V, § 8; Pen. Code, § 4800) and it is always possible that the present death penalty law or the sentencing provisions of the law might be invalidated in the future. (*People* v. *Nicolaus* (1991) 54 Cal.3d 551, 589 [286 Cal.Rptr. 628, 817 P.2d 893]; *People* v. *Gordon* (1990) 50 Cal.3d 1223, 1277 [270 Cal.Rptr. 451, 792 P.2d 251]; *People* v. *Thompson* (1988) 45 Cal.3d 86, 130 [246 Cal.Rptr. 245,

753 P.2d 37], cert. den. 488 U.S 960 [109 S.Ct. 404, 102 L.Ed.2d 392].) An instruction accurately advising the jury that the "real consequences" of a sentence of life without possibility of parole include those possibilities might prejudice a capital defendant. Were a jury advised of the possibility of release notwithstanding the "without possibility of parole" aspect of the life term, it might opt instead for death.

Defendant's observation that jurors sometimes ask whether a term of life without possibility of parole means what it says or if the defendant may ever be before a parole board or be released (see, e.g., *People* v. *Hill* (1992) 3 Cal.4th 959, 1011 [13 Cal.Rptr.2d 475, 839 P.2d 984]; *People* v. *Bonillas, supra,* 48 Cal.3d 757, 797; *People* v. *Caro* (1988) 46 Cal.3d 1035, 1064) [251 Cal.Rptr. 757, 761 P.2d 680], and his argument that the jury should be told that under a life without parole sentence the defendant cannot be granted parole and the sentence will result in actual imprisonment for the rest of the defendant's life confirms that his claim is not directed to the technical meaning of the term. Instead, his argument is actually that, in light of juror skepticism that a sentence of life without parole will be carried out as imposed, the court must instruct the jury sua sponte that if the defendant is sentenced to that term he will never be released. It is not an argument that the term has a technical meaning, but an argument that the court must instruct even though the meaning is perfectly clear that if the law changes in the future, or if the Governor exercises the constitutional power of commutation or pardon, the sentence might not be carried out as imposed. (The same is true of the death penalty, of course.)

*Simmons* v. *South Carolina* (1994) 512 U.S. 154 [114 S.Ct. 2187, 129 L.Ed.2d 133], on which defendant relies for his argument that our past decisions rejecting his argument must be reconsidered, does not support him. In *Simmons* the instruction given failed to advise the jury that under the sentence to "life imprisonment" a defendant whose future dangerousness was in issue was ineligible for parole. Unlike the instant case, the defendant had requested an instruction on the basis that many jurors did not understand that "life imprisonment" meant confinement without the possibility of parole. Here the jury was given the option of life without the possibility of parole, and counsel was permitted to argue that by its penalty verdict of life without possibility of parole defendant "is going to spend the rest of his life in prison and life without parole means what it says, ladies and gentlemen." Counsel also told the jury that notorious murderers who had received parole hearings did so under the old law, under the present law defendant would not have parole hearings, and "[h]e will not get out."

There was no error, and, even assuming that trial counsel had requested such an instruction, there is no demonstrable prejudice from its omission.

## B. *Sufficiency of Evidence of Prior Robbery*

 Defendant contends that the evidence was insufficient to support a finding that property was taken from Candeo Tresso in the Colorado incident by means of force or fear, an essential element of robbery, and thus this offense was improperly considered as an aggravating circumstance. However, defendant admitted to the investigating officer that he compelled Mrs. Tresso to accompany him as he ransacked the house looking for money. Her son testified that she was standing in the hallway "scared to death" when he entered the house shortly after defendant had broken in, raped Mrs. Tresso, ransacked the house, and stolen her property.

It is not necessary that there be direct proof of fear. That element may be proved with circumstantial evidence. Fear may be inferred from the circumstances in which a crime is committed or property is taken. (*People* v. *Iniguez* (1994) 7 Cal.4th 847, 857 [30 Cal.Rptr.2d 258, 872 P.2d 1183]; *People* v. *Brew* (1991) 2 Cal.App.4th 99, 104 [2 Cal.Rptr.2d 851]; *People* v. *Franklin* (1962) 200 Cal.App.2d 797, 798 [19 Cal.Rptr. 645].) Here fear might easily be inferred from the circumstances in which defendant obtained the property from Mrs. Tresso and the fear she still exhibited shortly thereafter. The evidence was sufficient to support a finding that Mrs. Tresso's property was taken by means of force or fear or that defendant was able to make his escape with the property because his victim was too terrified to attempt to prevent defendant's escape with her property.

## C. *Prior Burglary Stipulation*

After the People offered documentary evidence of the 1988 Colorado burglary in the form of certified court records, defendant stipulated that he was the person named in those documents. He now claims that his stipulation was not properly accepted because it was an admission that was subject to the advice regarding waiver of constitutional rights required by *In re Yurko* (1974) 10 Cal.3d 857 [112 Cal.Rptr. 513, 519 P.2d 561] (*Yurko*). We disagree.

The *Yurko* requirements apply to an admission of a prior felony conviction charged as an enhancement at the guilt phase of a criminal trial. (*People* v. *Guzman* (1988) 45 Cal.3d 915, 968 [248 Cal.Rptr. 467, 755 P.2d 917].) Defendant concedes that we have held that *Yurko* does not apply to prior convictions sought to be established as aggravating circumstances at the penalty phase of capital trial. (*People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1183-1184 [270 Cal.Rptr. 286, 791 P.2d 965].) We decline his invitation to reconsider that decision and the reasoning underlying it. It is unnecessary

therefore to consider respondent's argument that the stipulation to identity admitted only one aspect of the proof necessary to establish the prior conviction and would not be subject to the *Yurko* requirements in any case.

### D. *Prosecutorial Misconduct*

■ In the course of penalty phase argument, the prosecutor commented that defendant had opportunities to straighten out his life, but had continued to make wrong choices, including the attack on Ms. Axtell. He then stated: "He has continued to engage in this behavior. He has shown no remorse for the crime. You saw him testify in the guilt phase of the trial. Simply more lies to try and evade responsibility and then when those don't work, we now have a new set of explanations. Yes, I did it but. He has no remorse and once again he is trying to manipulate the system to his own benefit."

Defendant argues that reference to his asserted lack of remorse was an improper attempt to rely on a nonstatutory aggravating factor, and that trial counsel's failure to object reflects ineffective assistance of counsel. He also faults the prosecutor for failing to give notice that lack of remorse would be relied on as an aggravating circumstance. (See § 190.3, 4th par.)

Because there was no timely objection to the asserted misconduct or request for an admonition that the comment be disregarded, that claim was waived. (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1248 [283 Cal.Rptr. 144, 812 P.2d 163].) We therefore consider only the argument that failure to object reflects constitutionally ineffective assistance of counsel and reject that claim.

The prosecutor did not identify lack of remorse as an aggravating factor, and the reference to lack of remorse was not evidence presented without prior notice in violation of section 190.4. There is no statutory bar to a logical comment on a defendant's lack of remorse. (*People* v. *Breaux, supra,* 1 Cal.4th at p. 313.) To the contrary, we have recognized that consideration of lack of remorse is proper. "A defendant's remorse or lack thereof is a proper subject for the jury's consideration at the penalty phase [citation] and the prosecutor's comment thereon, which lacked any suggestion that the absence of remorse should be deemed a factor in aggravation of the offense, was proper." (*People* v. *Carrera* (1989) 49 Cal.3d 291, 339 [261 Cal.Rptr. 348, 777 P.2d 121].) The argument did not, as defendant asserts, focus the jury's attention on defendant's failure to testify at the penalty phase. It was clearly directed to the opportunities defendant had to express remorse in his statement to the police and guilt phase testimony. Inasmuch as the comment was not improper, counsel had no basis for an objection and the failure to object cannot be deemed incompetence.

E. *Double Jeopardy*

██ Defendant contends that the double jeopardy clause of the Fifth Amendment prohibits both multiple conviction and multiple punishment for the same offense. On that basis he argues that the convictions for rape, robbery and burglary should have been set aside, and that allowing the jury to consider his conviction as well as the circumstances of those offenses when determining the appropriate punishment was constitutionally impermissible.

Defendant relies in part on *People* v. *Wader*, *supra*, 5 Cal.4th 610, 670. There, we recognized that "the double jeopardy clause of the Fifth Amendment protects against, among other things, multiple punishments for the same offense (*North Carolina* v. *Pearce* (1969) 395 U.S. 711, 717 [23 L.Ed.2d 656, 664, 89 S.Ct. 2072].)" (*Ibid.*) We went on to state: "The high court has further held that a criminal defendant's 'sentence for both felony murder and the underlying felony violate[] the . . . . Double Jeopardy Clause['s] . . . protection against "multiple punishments for the same offense" imposed in a single proceeding. [Citation.]' " (*Ibid.*) We relied for that conclusion on *Jones* v. *Thomas* (1989) 491 U.S. 376, 381 [109 S.Ct. 2522, 2525-2526, 105 L.Ed.2d 322].

Defendant's claim overlooks the significance of the court's recognition that "[t]he court in *Jones* v. *Thomas*, *supra*, 491 U.S. 376, went on to note that in the case before it, the 'conviction of both felony murder and attempted robbery gave rise to a double jeopardy claim *only* because the Missouri Legislature did not intend to allow conviction and punishment for *both* felony murder and the underlying felony.' (*Id.* at p. 381 [105 L.Ed.2d at p. 331], first italics added.)" (*People* v. *Wader*, *supra*, 5 Cal.4th at p. 670, fn. 14.) In *Wader* it was unnecessary for the court to consider whether punishment for both felony murder and the underlying felonies violated the double jeopardy clause because the trial court had already stayed execution of the term for the underlying felony pursuant to section 654. Here, too, execution of sentence on the underlying felonies was properly stayed by the trial court.[27]

The 1978 death penalty law expressly provides that a felony underlying a felony-murder special circumstance "be charged and proved pursuant to the

---

[27]The California law permitting conviction of multiple offenses arising out of the same act, but not punishment, avoids the unacceptable result that would follow under the rule proposed by defendant if the murder conviction is reversed—release of the defendant because he could not be convicted of the underlying felony or felonies. (See *People* v. *Pearson* (1986) 42 Cal.3d 351, 360 [228 Cal.Rptr. 509, 721 P.2d 595]; *People* v. *Niles* (1964) 227 Cal.App.2d 749, 756 [39 Cal.Rptr. 11].)

general law applying to the trial *and conviction* of the crime." (§ 190.4, subd. (a), italics added.) Since section 190.3 expressly permits the sentencer to consider both the circumstances of the crime and a special circumstance based on conviction of a felony which underlies the first degree felony-murder conviction, there is no federal double jeopardy violation. (*People* v. *Gates* (1987) 43 Cal.3d 1168, 1189-1190 [240 Cal.Rptr. 666, 743 P.2d 301]; *People* v. *Balderas* (1985) 41 Cal.3d 144, 199-200 [222 Cal.Rptr. 184, 711 P.2d 480].)

F. *Cumulative Impact of Guilt and Penalty Phase Error on Penalty Determination*

Defendant argues that, because the jury was instructed that all guilt phase evidence should be considered in the penalty determination, the cumulative impact of guilt phase errors, even if harmless at the guilt phase, is prejudicial in the penalty phase. Therefore, unless the court is able to state that the guilt and penalty phase errors had no effect on the sentencing decision, that decision is not sufficiently reliable to satisfy the Eight Amendment. (*Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 341 [105 S.Ct. 2633, 2646, 86 L.Ed.2d 231].) In a related argument, he asserts that reversal of any special circumstance or conviction necessitates reversal of the penalty because "any substantial error occurring during the penalty phase of the trial . . . must be deemed to have been prejudicial" (*People* v. *Hamilton* (1963) 60 Cal.2d 105, 137 [32 Cal.Rptr. 4, 383 P.2d 412]) and any one of the felony convictions or special circumstances could have tipped the scales in favor of death in this case.

We do not agree with defendant's suggestion that reversal of any felony conviction or special circumstance automatically mandates reversal of the death penalty. ▄▄▄ Harmless error standards may be applied to penalty phase error. (*Sochor* v. *Florida* (1992) 504 U.S. 527, 532 [112 S.Ct. 2114, 2118-2119, 119 L.Ed.2d 326]; *Stringer* v. *Black* (1992) 503 U.S. 222, 230 [112 S.Ct. 1130, 1136, 117 L.Ed.2d 367]; *Clemons* v. *Mississippi* (1990) 494 U.S. 738 [110 S.Ct. 1441, 108 L.Ed.2d 725].) As explained above, however, there was no guilt phase error preserved for appeal and the evidence was sufficient to support all of the felony convictions and special circumstances. Therefore, we have no occasion to consider the impact of cumulative error on the penalty determination.

G. *Automatic Motion for Modification of Sentence*

Defendant contends that procedural irregularities or errors by the trial court in ruling on his automatic motion for modification of sentence

(§ 190.4) mandate reversal of the penalty. The claim is based on his assumption that the court reviewed the probation officer's report in advance of ruling on the motion and on what defendant argues is a failure to properly apply the law in making the ruling.

### 1. *Probation Officer's Report*

■ Section 190.4, subdivision (e) provides that, following the return of a verdict of death by a jury, the defendant is deemed to move for modification of the verdict. In ruling on that motion the court must "review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances . . . and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings."

In ruling on the motion for modification, the court is limited to consideration of the matters identified in section 190.4. Because the probation officer's report is not before the jury, it may not be considered. (*People* v. *Beeler, supra,* 9 Cal.4th at p. 1000.) In this case the judge signed the probation officer's report, indicating that he had read and considered it, on the day before the section 190.4 motion was denied. Defendant infers from this, the fact that there was no recess between the denial of that motion and the imposition of sentence, and the statute making review of the report a prerequisite to sentencing on the noncapital counts, that the court necessarily considered the probation officer's report in ruling on the section 190.4 motion.

We disagree. The record shows only that the court had read the probation report at the time the ruling on the section 190.4 motion was announced, not that the court considered the report in making the ruling. It is apparent from the court's statement explaining the denial of the section 190.4 motion, that the court had considered the section 190.4 motion in advance of the hearing, but not that the court had decided how it would rule or that the court's ruling was influenced by the information in the probation officer's report. The detailed section 190.4 statement, which reflects careful consideration of the evidence, refers only to evidence that was before the jury and the relevance of that evidence under the statutory aggravating and mitigating factors.

We will not assume that any extraneous matter in the probation officer's report influenced the trial court in denying the section 190.4 motion since there is nothing in the record to suggest that the court relied on anything other than the evidence before the jury. (*People* v. *Cain, supra,* 10 Cal.4th 1, 81.)

## 2. *Error in Applying the Law*

■ Defendant contends that the trial judge did not understand the statutory scheme and, as a result, did not make an independent de novo penalty determination after personally weighing the mitigating and aggravating factors. In support of that claim defendant asserts that the trial judge considered the circumstances of the instant crime under both factor (a) and factor (b) of section 190.3, and doubled the aggravating weight accorded to the circumstances of the crime. Factor (b) should be limited to criminal activity other than the circumstances of the capital murder (see *People* v. *Miranda* (1987) 44 Cal.3d 57, 106 [241 Cal.Rptr. 594, 744 P.2d 1127]).

The court did, as defendant notes, refer to the crimes of which defendant was convicted in this proceeding as criminal activity involving force or violence when discussing section 190.3, factor (b). There is no indication that the court believed that this criminal activity weighed more heavily on the aggravating side of the balance simply because it was considered under both factor (a) and factor (b) of section 190.3, however.

Defendant claims the court also erred in considering whether defendant acted under extreme mental or emotional disturbance (§ 190.3, factor (d)). The court stated a belief that, in weighing defendant's testimony that he "snapped" after being rebuffed in his sales efforts and the evidence that he acted under the effect of extreme mental disturbance, the jury could rely on a "reasonable man" standard and consider if the reasonable person would react as defendant did. This standard, he asserts, is that recognized by this court as identical to one found in Model Penal Code section 210.6, subdivision 4(b). (See *People* v. *Jackson* (1980) 28 Cal.3d 264, 316 [168 Cal.Rptr. 603] [169 P.2d 363].) Defendant claims this is error because the commentary to the Model Penal Code provision states that extreme emotional distress need not be subject to reasonable explanation or excuse in order to be considered mitigating and weighed against imposition of the death penalty. (Model Pen. Code and Commentaries (1980) com. 6 to § 210.6, p. 138.)

We agree that the "reasonable person" standard is inappropriate in determining whether a person actually acted under extreme mental or emotional disturbance. Factor (d) of section 190.3 permits consideration of any actual extreme mental or emotional disturbance from which the defendant suffered at the time of the offense. However, defendant has taken the court's reference to the jury's reliance on a "reasonable man" standard out of context. The remainder of the statement makes it clear that, even though the court may have erroneously considered what a reasonable person would have done in the circumstances, the court did not believe and thought that the jury did

not believe that extreme mental or emotional disturbance actually caused defendant to lose control.[28] The comment does not reflect a refusal to consider defendant's emotional state in possible mitigation of his crime.

Finally, defendant asserts that the court erred in its consideration of section 190.3, factor (h)—whether defendant could not conform his conduct to the law as a result of mental disease or defect or intoxication—a factor that may only be considered as mitigating (*People* v. *Montiel* (1993) 5 Cal.4th 877, 944 [21 Cal.Rptr.2d 705, 855 P.2d 1277]), by failing to consider the extensive evidence of mental defect offered at the penalty phase of the trial. He claims the court also erred in considering factor (h) by commenting on lack of remorse.

It is clear from other statements made by the judge, to which he referred when discussing section 190.3, factor (h), that he did consider the evidence of brain damage. He simply was not convinced by that evidence that defendant actually suffered brain damage, but was convinced that at the time of the offense defendant did know what he was doing and that it was wrong, and that if there was brain damage, it was not the cause of defendant's actions.

H. *Proportionality of the Penalty*

 Relying on *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], defendant argues that imposition of the penalty in the circumstances of his offenses violates both state and federal constitutional prohibitions of cruel and/or unusual punishment because death is a penalty that is disproportionate to his individual culpability. (U.S. Const., Amend. VIII; Cal. Const., art. I, § 17.) In particular he notes that the absence of a weapon demonstrates absence of advance planning; the fact that there is only one victim; the absence of savagery, prolonged torture, mutilation, or sadism; the fact that the victim was still alive when defendant left her; and the evidence that defendant's brain does not function properly, that his IQ is low, and he is unable to function outside an institution.

None of these factors warrant a conclusion that the penalty is disproportionate. As the trial judge observed, the jury may well have rejected the

---

[28]The court stated: "I think the trier of fact is entitled to rely on at least a reasonable man's standard, and ascertaining a reasonable person would not be frustrated to the extent of committing the acts that the defendant committed simply because he had been rejected by a prospective customer from making a sale. His actions were completely unreasonable in that regard and I do not think that the trier of fact, that is, the jury accepted his reason for committing the acts he did, nor do I.

"I might indicate that this happened once before in the state of Colorado. The defendant had attacked an elderly woman and on that occasion it was not because of frustration of trying to sell something. It was because he had committed a burglary and was caught in the act."

evidence on which defendant relies for the claim that his mental state makes him less culpable than other defendants on whom the death penalty has been imposed. The evidence would support a conclusion that the crimes were not planned in advance, but this court is not the trier of fact, and that conclusion is not compelled by the evidence. Defendant's culpability is enhanced by the separate invasions of the victim's interests that the special circumstance findings demonstrate—the safety of her home, her property, and her bodily integrity. (*People* v. *Melton* (1988) 44 Cal.3d 713, 767 [244 Cal.Rptr. 867, 750 P.2d 741].) The crime undoubtedly inflicted mental torture as well as physical violence on the victim, who was forced to accompany defendant to the bedroom, submit to his sexual assault, and lie apprehensively on the floor awaiting her uncertain fate as he ransacked her belongings while she suffered oxygen deprivation.

We perceive no basis for concluding that death is a disproportionate penalty.

### I. *Constitutional Invalidity of the 1978 Death Penalty Law*

While acknowledging that the court has rejected similar arguments in the past, defendant challenges the validity of the 1978 death penalty law on several grounds.

### 1. *Failure to Narrow Class of Offenses*

Defendant claims that the number of special circumstances (§ 190.2) under which a person convicted of first degree murder may be eligible for imposition of the death penalty (27 at the time he was prosecuted) is so large that the 1978 death penalty law fails to meet the constitutional command of the Eighth Amendment to the United States Constitution. As construed by the United States Supreme Court, the Eighth Amendment requires that a death penalty law "rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not" (*Spaziano* v. *Florida* (1984) 468 U.S. 447, 460 [104 S.Ct. 3154, 3162, 82 L.Ed.2d 340]), and establish "rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold." (*McCleskey* v. *Kemp* (1987) 481 U.S. 279, 305 [107 S.Ct. 1756, 1774, 95 L.Ed.2d 262].)

The California law, defendant argues, fails to meet constitutional standards because it makes almost anyone convicted of first degree murder eligible for the death penalty. All except one category of first degree murder made so on the basis of the means used and all categories of felony

murder enumerated in section 189 are made death eligible through identification of the same criteria that establish those categories of first degree murder as special circumstances. (§ 190.2, subd. (a)(4), (6), (15), former subd. (a)(17)(i)-(ix), (18), and (19).) This court's construction of "lying in wait," he contends, adds almost all premeditated murders to the category of first degree murders eligible for the death penalty. Section 190.3, which identifies aggravating factors which must be found to exist (and to outweigh mitigating factors) does not further limit the class because many aggravating factors may be found on the basis of the same conduct that establishes the required elements of first degree murder and underlies the qualifying special circumstance.

Defendant recognizes that we have repeatedly rejected the claim that the California death penalty law fails to serve a narrowing purpose and to distinguish those persons convicted of first degree murder on whom the death penalty is imposed from those on whom it is not on the basis of any identifiable narrowing principle. (See, e.g., *People* v. *Ray* (1996) 13 Cal.4th 313, 356-357 [52 Cal.Rptr.2d 296, 914 P.2d 846]; *People* v. *Crittenden, supra,* 9 Cal.4th at pp. 154-156; *People* v. *Bacigalupo* (1993) 6 Cal.4th 457 [24 Cal.Rptr.2d 808, 862 P.2d 808].) We decline his invitation to reconsider those decisions.

2. *Penal Code Section 190.3, Factor (d)*

■■■ Defendant next argues that "factor (d)" (§ 190.3, factor (d)), and CALJIC No. 8.85, the implementing instruction, are constitutionally invalid limitations on the scope of mitigating evidence a defendant may offer. Factor (d) permits the jury, in deciding the appropriate penalty, to consider "[w]hether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance." It is a mitigating factor (*People* v. *Montiel, supra,* 5 Cal.4th 877, 944), which defendant contends restricts the jury from consideration of mental or emotional disturbance that is not "extreme."

Defendant concedes that this court has repeatedly upheld the validity of section 190.3, factor (d) (see *People* v. *Mayfield* (1993) 5 Cal.4th 142, 184-185 [19 Cal.Rptr.2d 836, 852 P.2d 331]), reasoning that factor (k) (§ 190.3, factor (k)), which allows consideration of evidence of "[a]ny other circumstance which extenuates the gravity of the crime . . ." offered by the defendant encompasses other mental and emotional states. (See, e.g., *People* v. *Turner* (1994) 8 Cal.4th 137, 208 [32 Cal.Rptr.2d 762, 878 P.2d 521].) He disagrees with that conclusion, arguing that a reasonable juror could understand factor (d) to define the only type of emotional or mental disturbance that may be considered mitigating. He also questions whether a juror is able

to comprehend the terms "under the influence of," "extreme," and "disturbance," which he claims are vague and not familiar to jurors.

We reject both contentions. Defendants are permitted to offer evidence of any degree of mental or emotional disturbance and to argue its relevance to the penalty determination. Defendant did so here. It is apparent to the jury that the evidence is relevant and may be weighed as mitigating evidence in determining the appropriate penalty.

The statutory terms are not vague. They are commonly understood and take on no arcane meaning when applied in the context of penalty phase deliberations.

### 3. *Penal Code Section 190.3, Factor (a)*

Defendant also claims that "factor (a)" (§ 190.3, factor (a)) and the implementing instruction are misleading in that they may lead a jury to count the circumstances of the crime and the existence of special circumstances more than once when determining the appropriate penalty. Factor (a) identifies among the statutory aggravating and mitigating circumstances "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1." This might occur, he reasons, because the circumstances of the crime, a statutory circumstance which the jury is directed to consider, encompass some special circumstances, such as murder in the commission of an enumerated felony. (§ 190.2(a)(17).) Thus, theoretically, the jury may consider, as separate aggravating factors, robbery as a circumstance of the crime and robbery as a felony-murder special circumstance, thereby artificially inflating the weight to be given the underlying offense. (See *People* v. *Melton, supra,* 44 Cal.3d at p. 768; *People* v. *Bean, supra,* 46 Cal.3d 919, 955.)

The possibility that a statutory factor or instruction in isolation might be misleading does not in and of itself require a conclusion that it is constitutionally invalid, or that a defendant suffers prejudice. A defendant may request a clarifying instruction admonishing the jury not to double-count the circumstances of the crime and the special circumstances it found true as more than one aggravating factor. (*People* v. *Ashmus, supra,* 54 Cal.3d 932, 997.) Defendant did not do so. Moreover, other instructions and/or the argument of counsel may adequately inform the jury of the importance and relevance of the factors. Here, defendant's concern is undercut by the fact that the jury was instructed that weighing the aggravating and mitigating circumstances is not a mechanical counting of factors and that in determining the appropriate penalty, it was to consider the totality of the aggravating

and mitigating circumstances. This followed the prosecutor's admonition that the penalty determination did not call for a mechanical procedure, the jury was not to simply add up the factors on the aggravating and mitigating side, and that the aggravating "evidence" must substantially outweigh the mitigating "evidence" to support imposition of the death penalty. In his argument he treated the manner of killing, the decision to break into the house to commit murder, and the commission of the offenses which led to the special circumstance findings as a single aggravating factor. This overlap is constitutionally permissible. (*People* v. *Melton*, *supra*, 44 Cal.3d at p. 996.)

### 4. *Method of Execution*

Defendant contends that execution by lethal gas, the only method of execution authorized by section 3604 at the time he was sentenced, has been found to violate the Eighth Amendment proscription of cruel and unusual punishment. (*Fierro* v. *Gomez* (N.D.Cal. 1994) 865 F.Supp. 1387, 1415; affd. (9th Cir. 1996) 77 F.3d 301.) Section 3604 has since been changed to afford a defendant a choice between lethal gas or intravenous injection. (Stats. 1992, ch. 558, § 2.) That option is retroactive. (§ 3604, subd. (b).) Defendant claims, nonetheless, that his sentence must be set aside and a new sentencing hearing granted since he will not be executed under the method envisioned by the jury. He contends that when a circumstance relied on by the jury in reaching its sentencing choice is changed after the verdict, that verdict is no longer reliable. He argues, in effect, that had the jury been aware that he would be executed by what some consider to be a more humane process, it would not have sentenced him to death.

The method of execution is not a circumstance shown to have been relied on by the jury, however. Moreover, invalidation of the means by which a sentence is carried out does not affect the validity of the sentence. (*People* v. *Berryman*, *supra*, 6 Cal.4th 1048, 1110.) Finally, the decision on which defendant relies, which would not be binding on this court in any case (*People* v. *Santamaria* (1994) 8 Cal.4th 903, 923 [35 Cal.Rptr.2d 624, 884 P.2d 81]), has been vacated and remanded to the United States Court of Appeals for the Ninth Circuit for further consideration in light of the amended version of section 3604. (*Gomez* v. *Fierro* (1996) __ U.S. __ [117 S.Ct. 285, 136 L.Ed.2d 204].)

### 5. *Miscellaneous Claims*

Recognizing that we have repeatedly rejected them, but reraising them with an invitation to reconsider our past decisions (and apparently to pre-serve the constitutionally based claims for federal review), defendant contends:

a. Failure of section 190.3 to identify those factors which are mitigating and those which are aggravating renders the statute impermissibly vague, arbitrary, and capricious because it fails to give the jury any meaningful or principled guidance, leaving the jury with complete discretion as to the appropriate penalty. The statute permits jurors to consider, as aggravating factors, several which under the Eighth Amendment may only be considered mitigating (*Zant* v. *Stephens* (1983) 462 U.S. 862, 885 [103 S.Ct. 2733, 2747, 77 L.Ed.2d 235]), such as mental or emotional disturbance, alcohol or drug impairment, and positive background/character evidence. Others, such as section 190.3, factors (d), (e), (f), (h), (j) and (k), which are intended to be considered only mitigating, may be considered aggravating by an unguided juror, rendering them impermissibly vague in violation of the Eighth Amendment.

b. Failure of the court to delete irrelevant factors permits the jury to rely on factors that should not play a role in the sentencing process, and artificially inflates the factors favoring death. This violates the requirement of heightened reliability in capital sentencing determinations imposed by the Eighth and Fourteenth Amendments.

c. Failure to require written findings of the aggravating factors found to be true deprives a defendant of the due process and meaningful appellate review required by the Eighth Amendment. The potential for prejudice is increased by the absence of meaningful guidance as to which factors may be considered only in mitigation and the inability of jurors to recognize those factors that may not be considered aggravating. The sentence is, therefore, unreliable.

d. Failure to require that aggravating factors be proved beyond a reasonable doubt, that aggravation be found weightier than mitigation beyond a reasonable doubt, and that death be found the appropriate penalty beyond a reasonable doubt violated federal due process principles, denied equal protection, and violated the Eighth Amendment requirement of heightened reliability in a death penalty determination.

e. Lack of intracase and intercase proportionality review at trial or on appeal violates the right to equal protection since noncapital defendants receive such review, as well as the Fifth, Sixth, Eighth and Fourteenth Amendment requirements that the death penalty not be imposed arbitrarily or capriciously, that all potential mitigating factors be considered, that meaningful appellate review be afforded, and that heightened reliability be assured in capital cases.

f. Reliance on evidence of unadjudicated criminal activity violates due process and the Fifth, Sixth, Eighth and Fourteenth Amendments, rendering the death sentence unreliable.

g. Failure to require unanimous or majority agreement that prior crimes were committed permits unreliable factual determinations inconsistent with the Sixth Amendment right to jury trial and the Eighth Amendment requirement of enhanced reliability in capital sentencing.

h. The statutory description of some mitigating factors as "substantial" and "extreme" renders those factors unconstitutionally vague and acts as a barrier to consideration of those factors in mitigation in violation of the Eighth Amendment.

i. The failure to define the word "mitigation" precludes jury consideration of the full scope of evidence relevant to the determination of the appropriate penalty, again undermining the reliability of the penalty determination in violation of the Eighth Amendment. Recent studies establish that even college-educated jurors are unable to define mitigation in a legally correct manner.

j. Vesting the county district attorney with complete discretion over the selection of cases in which to seek the death penalty creates an unconstitutionally substantial risk of county-by-county arbitrary charging decisions for defendants with similar backgrounds who commit similar crimes. The absence of statewide standards invites reliance on constitutionally impermissible standards including race and economic status and compounds the impact of the vague and arbitrary statutory death penalty law.

k. Both lethal gas and lethal injection constitute cruel and unusual punishment under the Eighth Amendment, the former for the reasons stated in *Fierro* v. *Gomez, supra,* 865 F.Supp. 1387, the latter as a result of problems in administration which cause "brutal, agonizing and cruel punishment."

As we held in *People* v. *Berryman, supra,* 6 Cal.4th at page 1110, however, an imperfection in the method of execution does not affect the validity of the judgment and is not a basis for reversal of the judgment on appeal. In any event, we reject the claim, which is based on anecdotal evidence of the administration of lethal injection in other states, and does not support a conclusion that this method of execution as administered in California violates the Eighth Amendment.

We decline defendant's invitation to reconsider the other challenges to the validity of the 1978 death penalty law and procedures outlined above, all of which have been repeatedly rejected in past decisions of this court and the United States Supreme Court. (See, e.g., *Tuilaepa* v. *California* (1994) 512 U.S. 967 [114 S.Ct. 2630, 129 L.Ed.2d 750]; *Pulley* v. *Harris* (1984) 465

U.S. 37 [104 S.Ct. 871, 79 L.Ed.2d 29]; *People* v. *Jackson* (1996) 13 Cal.4th 1164, 1245-1246 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; *People* v. *Arias* (1995) 13 Cal.4th 92, 187-188, 190 [51 Cal.Rptr.2d 770, 913 P.2d 980]; *People* v. *Medina* (1995) 11 Cal.4th 694, 772 [47 Cal.Rptr.2d 165, 906 P.2d 2]; *People* v. *Hawkins* (1995) 10 Cal.4th 920, 974 [42 Cal.Rptr.2d 636, 897 P.2d 574]; *People* v. *Crittenden*, *supra*, 9 Cal.4th 83, 156; *People* v. *Turner*, *supra*, 8 Cal.4th 137, 207-209; *People* v. *Kirkpatrick* (1994) 7 Cal.4th 988, 1018 [30 Cal.Rptr.2d 818, 874 P.2d 248]; *People* v. *Berryman*, *supra*, 6 Cal.4th 1048, 1101-1102, 1109; *People* v. *Wash*, *supra*, 6 Cal.4th 215, 272; *People* v. *Webb*, *supra*, 6 Cal.4th 494, 532-533; *People* v. *Wader*, *supra*, 5 Cal.4th 610, 670; *People* v. *Espinoza* (1992) 3 Cal.4th 806, 827 [12 Cal.Rptr.2d 682, 838 P.2d 204]; *People* v. *Keenan* (1988) 46 Cal.3d 478, 505 [250 Cal.Rptr. 550, 758 P.2d 1081].)

## VII

## OTHER CLAIMS

### A. *Ineffective Assistance of Counsel*

 Defendant accuses trial counsel of following a "pattern of sloppy, unfocused and incompetent advocacy," asserting that he failed to establish a consistent trial strategy or to utilize uniform tactics in support of a strategy, did not identify and respond to obvious areas of community prejudice, and actually introduced elements of racial prejudice.

 The Sixth Amendment guarantees competent representation by counsel for criminal defendants. We presume that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant trial decisions. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 690 [104 S.Ct. 2052, 2065-2066, 80 L.Ed.2d 674]; *People* v. *Freeman* (1994) 8 Cal.4th 450, 513 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888].) A meritorious claim of constitutionally ineffective assistance must establish both: "(1) that counsel's representation fell below an objective standard of reasonableness; *and* (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted. [Citations.] If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails. Moreover, ' "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." [Citation.].' " (*People* v. *Rodrigues*, *supra*, 8 Cal.4th at p. 1126.)

A court reviewing the conduct of counsel must in hindsight give great deference to counsel's tactical decisions. (*In re Fields* (1990) 51 Cal.3d 1063, 1069-1070 [275 Cal.Rptr. 384, 800 P.2d 862].)

In support of his claim of ineffective counsel, defendant asserts that counsel failed to adequately inquire into the racial views of potential jurors during voir dire, did not seek cautionary instructions on racial prejudice, and essentially ignored the specter of racial prejudice that inhered in the trial of a young African-American man charged with the sexual assault on and murder of an older White woman. He also faults counsel for failing to rehabilitate potential jurors who had expressed reservations about the death penalty, failing to elicit crucial information from another potential juror that later led to her excusal, failing to inquire into jurors' possible fear of door-to-door salespeople, and performing in a manner that was tantamount to abandoning the duty to ensure a bias-free jury.

Defendant also asserts that counsel's failures deprived him of specific intent defenses to the crimes with which he was charged when counsel withheld evidence of mental illness and brain dysfunction until the penalty phase of the trial and that counsel's cross-examination of witnesses was incompetent and elicited nothing of value. He claims that counsel's opening statement at the penalty phase was harmful, that counsel's performance during the presentation of evidence reflected a lack of adequate preparation, that racial prejudice was injected into the penalty phase when counsel explained to the jury why he had selected an African-American expert, and that counsel's penalty phase argument was inadequate.

Many of defendant's contentions appear to represent nothing more than alternatives which present counsel, blessed with hindsight and aware of the failure of trial counsel's tactics, believes might have offered a stronger defense. We do not agree with defendant that the examples of what defendant identifies as inadequate performance are necessarily such or that there could be no plausible tactical justification for the tactics employed by trial counsel. For that reason it is not possible to assess many of defendant's claims on an appellate record which does not reflect the reasons for the actions which defendant now claims fell below constitutional standards of competence. ▮ When the record does not shed light on why counsel acted or failed to act in a particular manner, claims of ineffective counsel based on that conduct must be presented by petition for writ of habeas corpus. (*People* v. *Williams*, *supra*, 44 Cal.3d 883, 917, fn. 12; *People* v. *Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

▮ Moreover, defendant fails to establish prejudice with regard to any of his claims. The instances of allegedly inadequate voir dire are not shown to have resulted in the seating of a trial juror harboring racial prejudice. Defendant presumes that jurors harbor bias against African-American defendants whenever the victim is a White female, and on that basis argues that

counsel failed in his obligation to conduct a searching examination of the prospective jurors in an attempt to discern such bias. Assuming arguendo that such bias exists, the record does not suggest that any biased juror actually served, and our review of the record satisfies us that counsel did not abandon his proper role in jury selection.

Nor do we share the presumptions, inherent in defendant's claim that counsel should have done more to rehabilitate the prospective jurors who had reservations about the death penalty, that further voir dire would have been fruitful and that counsel wanted those persons to serve on the jury. As we have noted above, most jurors who were excused on *Witherspoon-Witt* challenges expressed unequivocal opposition to the death penalty and inability to impose it. Prospective juror Erlinda Jones, was so obdurate in her refusal to express her views and so distressed by the court's attempt to elicit them that counsel may have concluded that she would not be able to focus on the evidence and follow the court's instructions. This record is not adequate to demonstrate prejudice in any event since it offers no basis for concluding that further voir dire would have been helpful in clarifying Jones's views or that Jones could have been death qualified.

Contrary to defendant's assertion, the record does not reflect an absence of a focused trial strategy. Counsel's performance and tactical decisions must be viewed with recognition that he represented a defendant who had made a pretrial statement admitting many if not most of the elements of the charged offenses; further, the physical evidence that was to be offered, when coupled with defendant's statement, may well have convinced counsel that a jury would be more favorably disposed toward defendant at the penalty phase if he did not attempt to defend by offering the mental state evidence. Since the prosecutor might seek a first degree murder verdict on a felony-murder theory based on the other felonies with which defendant was charged, and defendant had admitted entering Ms. Axtell's residence with the intent to commit theft, counsel could reasonably conclude that the mental state evidence defendant now claims should have been offered at the guilt phase was too weak to persuade a jury that defendant was not guilty of first degree murder with special circumstances. We have recognized before the difficulties faced by counsel representing a defendant who has admitted the charged offenses and described them to the police. (See *People* v. *Williams*, *supra*, 44 Cal.3d at p. 922.) Second-guessing the trial strategy of counsel who, in that situation, focus their efforts on a penalty phase defense rather than risk losing credibility in an attempt to persuade the jury the defendant is not guilty, is rarely warranted. (See *People* v. *Kelly*, *supra*, 1 Cal.4th 495, 521; *People* v. *Cox* (1991) 53 Cal.3d 618, 661 [280 Cal.Rptr. 692, 809 P.2d 351].)

For the same reason we cannot agree that counsel's tactics in opening statements or closing arguments reflect incompetence. At the penalty phase counsel told the jury that he knew when the case was assigned to him and he reviewed the police report that he "was going to address twelve people for John's life." He then noted that the crime was tragic and made no sense, leading into an argument that was very focused. The argument focused on the extensive evidence of organic brain damage suffered at birth, the impact on defendant of repeated failures to diagnose and properly treat that condition, and the expert opinion that during the crimes defendant was in a fugue state caused by the brain damage.

Some alternative lines of argument suggested by defendant, such as telling the jurors how the felony convictions should be considered, might have placed what counsel believed was undue emphasis on the number of felonies defendant had committed. We cannot say on this record that counsel's decision to focus primarily on defendant's mental state, its causes, and the failure of various responsible agencies to diagnose and properly treat him as a child was not a reasonable decision, or assuming arguendo that it was not, that defendant suffered prejudice.

B. *Absence From Trial*

■■■ Section 977 mandates that a felony defendant be present at arraignment, plea, preliminary hearing, proceedings during which the trier of fact receives evidence, and at sentencing. At other proceedings the defendant is to be present unless he has executed a written waiver with the court's permission. This court has held, however, that neither this statutory mandate nor the constitutional right to be present at trial extends to chambers or bench discussions outside the presence of the jury when those matters do not bear a reasonably substantial relation to the opportunity to defend. (*People* v. *Freeman, supra,* 8 Cal.4th at p.479; *People* v. *Medina* (1990) 51 Cal.3d 870, 902-903 [274 Cal.Rptr. 849, 799 P.2d 1282]; *People* v. *Jackson, supra,* 28 Cal.3d at pp. 309-310.)

■■■ Defendant now claims that he was denied his fundamental statutory and constitutional (Cal. Const., art. I, § 15) right to be present at trial as he was absent during a variety of proceedings. None of the proceedings he identifies in support of this claim is shown to be one that bore any substantial relation to defendant's opportunity to defend.[29] Since his presence at these proceedings was not necessary to protect his interests, assure him a fair

---

[29]The proceedings were: an all-day conference on jury selection procedures and *in limine* motions; an in-chambers discussion of seating and security arrangements; in-chambers discussions of juror hardship forms; an in-chambers discussion on the timing of questioning

and impartial trial, or assist counsel in defending the case, there was no error in conducting the proceedings in his absence and reversal of the judgment is not warranted.

Defendant contends that his absence from proceedings at which evidentiary motions, the admissibility of his statement, and a possible objection to an anticipated question by the prosecutor were discussed, denied him his Sixth Amendment right to confront the evidence against him, an interference with his opportunity for effective cross-examination. He also claims that conducting the proceedings in his absence resulted in a trial in which the Sixth Amendment goal of both the perception and the reality of fairness was not met and which violated the due process guaranty of the Fourteenth Amendment.

As respondent notes, however, defendant prevailed in the matters discussed at some of the in-chambers proceedings at which he was not present, and defendant does not suggest how his presence would have had any impact on the matters discussed at any of the proceedings. The record confirms that one conference was about testimony by a jailhouse informer. No such testimony was introduced. A request by defendant for open-ended voir dire questions was granted at another. The prosecutor did not object to a defense request for access to jurors' addresses, and agreed with a request for sequestered voir dire during other proceedings. At another, defense counsel sought a ruling that he could use prior convictions to impeach prosecution witnesses. He was permitted to do so at trial. The other evidentiary matters discussed involved the use of photographs. There is no indication that defendant's presence at these proceedings might have had any impact. The same is true of the remaining proceedings. The proceedings were routine. Defendant fails to demonstrate that, as a result of the in-chambers discussions or sidebar conferences his ability to confront evidence and cross-examine witnesses was affected in any manner.

Because we have held that the requirement of written waiver applies only to proceedings which bear a substantial relation to a defendant's opportunity to defend, and these proceedings did not have such a relationship, defendant was not denied due process by a failure to comply with section 977. The

individual jurors on hardship; sidebar discussions of a challenge for cause, defense counsel's prior representation of a prospective juror, and whether to continue death qualification of prospective jurors; in-chambers discussions of guilt and penalty phase jury instructions; an in-chambers examination of Juror Ross; a sidebar proceeding about the scheduling of prosecution witnesses; in-chambers discussions of the use of an out-of-court statement by defendant to a jailer and waiver of defendant's right against self-incrimination prior to testifying; an in-chambers discussion of penalty phase witness scheduling; and a sidebar discussion of a possible objection.

failure to comply with section 977 in proceedings such as these, which are ancillary to jury selection, taking of evidence before the trier of fact, and sentencing, is not, as defendant contends, a "structural defect" which requires reversal irrespective of prejudice. (See *Arizona* v. *Fulminante* (1991) 499 U.S. 279, 310 [111 S.Ct. 1246, 1265, 113 L.Ed.2d 302].)

### C. *Failure to Report Proceedings*

■ Section 190.9, subdivision (a), mandates that all proceedings in a capital case be conducted on the record and reported. Defendant complains that some 28 proceedings, many noted immediately above (see, *ante,* fn. 29), in this case were not reported. Absent prejudice, this omission is not a basis for reversal of the conviction, however. (See *People* v. *Freeman, supra,* 8 Cal.4th at p. 509; *People* v. *Roberts* (1992) 2 Cal.4th 271, 325-326 [6 Cal.Rptr.2d 276, 826 P.2d 274].)[30]

The omission is not a "structural defect" or a denial of due process. As we explained in *People* v. *Morris, supra,* 53 Cal.3d at p. 210, fn. 10, a failure to comply with the statute may engender disputes as to what took place and delay settlement of the record. Since procedures for settlement of the record are often adequate to resolve those disputes and avoid any prejudice, however, a defendant bears the burden of demonstrating that the record is not adequate to permit meaningful appellate review. (*People* v. *Cummings* (1993) 4 Cal.4th 1233, 1333, fn. 70 [18 Cal.Rptr.2d 796, 850 P.2d 1].)

Here a settled statement created an adequate record for 19 of the 28 unreported proceedings. Most were clearly inconsequential.[31] The record is adequate to satisfy us that the trial court did not conduct any off-the-record proceedings of consequence. We will not presume that the nine unreported proceedings for which a settled statement is not available differed in nature from those for which a settled statement is available.

### D. *Appellate Delays*

Defendant next contends that the three-year delay in appointment of appellate counsel denied him his due process right to a speedy appeal. He

---

[30]We again note our disapproval of these clear violations of section 190.9. Court and counsel by now should be well aware of the importance of complying with section 190.9, which was enacted in 1984. (Stats. 1984, ch. 1422, § 2, p. 4994.)

[31]Three were discussions of the availability of the judge for trial, the discussion of security arrangements for the sequestered voir dire, juror hardship forms, whether to begin hardship questioning before or after lunch, the voir dire of Juror Ross, two discussions about witness scheduling, whether to continue death qualification of jurors, use of defendant's statement, and three discussions of instructions.

relies on cases such as *U.S.* v. *Antoine* (9th Cir. 1990) 906 F.2d 1379, 1382, *Harris* v. *Champion* (10th Cir. 1994) 15 F.3d 1538, 1546, and *U.S.* v. *Tucker* (9th Cir. 1993) 8 F.3d 673, 676, for the existence of such a right. None of those decisions address the unique demands of appellate representation in capital cases.

Neither this court, nor the United States Supreme Court, has extended the Sixth Amendment right to speedy trial to appeals in the manner suggested by defendant. Assuming, but not deciding, that such a right exists, defendant fails to demonstrate that the delay inherent in the procedures by which California recruits, screens, and appoints attorneys to represent capital defendants on appeal, is not necessary to ensure that competent representation is available for indigent capital appellants. Moreover, defendant fails to suggest any impact that the delay could have on the validity of the judgment rendered before that delay occurred.

VIII

DISPOSITION

The judgment is affirmed in all respects.

George, C. J., Kennard, J., and Chin, J., concurred.

**WERDEGAR, J.,** Concurring and Dissenting.—I concur in the majority opinion's affirmance of the judgment of guilt. With due respect, however, I conclude the majority fails to appreciate the seriousness of the trial court's misunderstanding of Penal Code section 190.3, factor (d) (hereafter factor (d)), when ruling on the automatic motion for modification of the verdict (Pen. Code, § 190.4, subd. (e) (hereafter section 190.4(e)); further statutory references are to this code). As I explain, because I cannot conclude the court's misunderstanding had "no impact" on the trial court's decision to deny the modification motion (*People* v. *Jones* (1997) 15 Cal.4th 119, 201 [61 Cal.Rptr.2d 386, 931 P.2d 960] (conc. and dis. opn. of Werdegar, J.); *People* v. *Cooper* (1991) 53 Cal.3d 771, 848 [281 Cal.Rptr. 90, 809 P.2d 865]), I would vacate the penalty judgment and remand for a new hearing on the automatic modification motion.

The applicable law is stated in *People* v. *Ashmus* (1991) 54 Cal.3d 932, 1006-1007 [2 Cal.Rptr.2d 112, 820 P.2d 214]: " 'In ruling on a verdict-modification application, the trial judge is required by section 190.4(e) to "make an independent determination whether imposition of the death penalty upon the defendant is proper in light of the relevant evidence and the

applicable law." That is to say, he must determine whether the jury's decision that death is appropriate under all the circumstances is adequately supported. And he must make that determination independently, i.e., in accordance with the weight he himself believes the evidence deserves.' (*People* v. *Marshall* [(1990)] 50 Cal.3d [907,] 942 [269 Cal.Rptr. 269, 790 P.2d 676], citations omitted.) Obviously, the evidence that he considers is that which was properly presented to the jury [citation]—no more, no less [citation]. [¶] On appeal, we subject a ruling on a verdict-modification application to independent review: the decision resolves a mixed question of law and fact; a determination of this kind is generally examined de novo [citations]. Of course, when we conduct such scrutiny, we simply review the trial court's determination after independently considering the record. We do not ourselves decide the verdict-modification application."

When, from the trial court's statement in ruling on the modification motion, it is apparent the court misunderstood the law, we will nevertheless affirm the judgment if we can conclude "any misunderstanding [on the trial judge's part] 'had no impact on the court's decision to deny the motion.' " (*People* v. *Cooper, supra,* 53 Cal.3d at p. 848.)

In this case, defendant's primary showing in mitigation of penalty consisted of extensive evidence he suffered from brain damage. For purposes of choosing an appropriate penalty, this evidence was relevant to factor (d), which provides the trier of fact (and, hence, the trial court when ruling on a modification motion) "shall take into account . . . [¶] . . . [¶] (d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance."

Although the trial court recognized defendant's proffered evidence was potentially mitigating, the court appeared to apply—erroneously—a "reasonable person" standard to this evidence, stating: "I think the trier of fact is entitled to rely on at least *a reasonable man's standard, and certainly a reasonable person would not be frustrated to the extent of committing the acts that the defendant committed* simply because he had been rejected by a prospective customer from making a sale. [Defendant's] actions were completely unreasonable in that regard and I do not think that the trier of fact, that is, the jury accepted his reason for committing the acts he did, *nor do I.*" (Italics added.)

The trial court's apparent reliance on a reasonable person standard was error because the reasonable person standard is inapplicable to the type of assessment called for by section 190.4(e). The relevant inquiry is whether, under factor (d), "the offense was committed while the defendant *was under*

the influence of extreme mental or emotional disturbance." (Italics added.) As does the majority (see maj. opn., *ante*, at p. 695), I take the highlighted phrase to mean "was *actually* under." Thus, the trial court properly could have discounted defendant's evidence of a mental disturbance either because no substantial evidence established such disturbance, or because the court found the defense experts on this topic not credible. The trial court's responsibility, in other words, is to determine whether the evidence shows defendant *was actually* under such influence. If the court finds in the affirmative, it must then go on and weigh that fact (along with any other factor in mitigation) against the aggravating factors established by the evidence.

What the trial judge cannot do is discount the persuasive force of the proffered mitigating evidence due to a belief *a reasonable person would not have been* under such influence. Indeed, the entire point of defendant's mitigating evidence was that, as a result of brain damage occurring during birth, he did not respond to external stimuli and stressors as would a reasonable person with an undamaged brain. By subjecting defendant's penalty evidence to a reasonable person standard, the trial court misapprehended the meaning of factor (d) and failed to accord defendant's mitigating evidence the weight to which it was legally entitled.

Was the trial court's misunderstanding harmless? Asked differently, can we conclude the misunderstanding " 'had no impact on the court's decision to deny the motion.' "? (*People* v. *Cooper, supra,* 53 Cal.3d at p. 848, quoting *People* v. *Karis* (1988) 46 Cal.3d 612, 652 [250 Cal.Rptr. 659, 758 P.2d 1189].) The evidence suggesting defendant suffered from brain damage was the primary mitigating evidence presented to the jury; yet the trial court, when ruling on the section 190.4(e) motion for modification, evidently failed to appreciate the import of this evidence due to its misapprehension of the law. As I stated in my concurring and dissenting opinion in *People* v. *Jones, supra,* 15 Cal.4th 119, 198, "[a]lthough in ruling on a verdict modification motion a trial judge must make an 'independent' determination whether imposition of the death penalty upon the defendant is proper, independence in this context refers to according the evidence the weight the judge himself or herself believes it deserves, *in light of the applicable law* . . . . [Citation.]" (*Id.* at p. 203, italics added.) Defendant was deprived of this determination. Accordingly, I conclude he was prejudiced by the error.

I respectfully disagree with my colleagues in the majority to the extent they read the trial court's statement as meaning the court actually considered defendant's evidence of a possible "extreme mental or emotional disturbance" free from the distorting effects of the reasonable person standard. It

is true the trial court's comment ("nor do I [accept the defendant's reason]") could mean the court merely disbelieved defendant's evidence he suffered from brain damage. Read in context, however, it seems clear the court made that comment in relation to its assumption a reasonable person standard applied in this context.

I would vacate the judgment and remand for a new hearing on the automatic motion under section 190.4(e), to permit the trial court to apply the correct legal standard when ruling on the motion. I express no view as to the proper outcome of such a hearing.

Mosk, J., and Brown, J., concurred.

Appellant's petition for a rehearing was denied July 9, 1997, and the opinion was modified to read as printed above.